LILLIE, J.
 

 By an amended information Jones and McLemore were charged with
 
 [1]
 
 (Count I), obstructing or resisting police officers in the performance of their duties (Count II) and assault by means of force likely to produce great bodily harm (Count III); in Count IV of the same amended information McLemore alone was charged with a
 
 *462
 
 violation of section 245, Penal Code (Assault by means of force likely to produce great bodily harm). Trial was to a jury which found Jones guilty as charged and McLemore guilty on Counts II and IV only. Their motions for new trial having been denied, each has appealed from the judgment (order granting probation).
 

 The events precipitating the present prosecution occurred on Memorial Day of 1961 in Griffith Park. Part of such property, now centrally located, was granted in 1896 to the City of Los Angeles by its owners for use as a public park—“ ‘for purposes of recreation, health and pleasure, for the use and benefit of the inhabitants of said City of Los Angeles, forever’ ”
 
 (Griffith
 
 v.
 
 Department of Public Works,
 
 141 Cal.App.2d 376, 377 [296 P.2d 838]), another part was later acquired by the city by purchase “ ‘for park and playground purposes.’ ”
 
 (Griffith
 
 v.
 
 Department of Public Works,
 
 52 Cal.2d 848, 849 [345 P.2d 469].) In midafternoon of the day in question, about a dozen boys became unruly in the area of the merry-go-round. The operator testified that “they were racing around from one part of the merry-go-round to the other, as well as jumping off and on the machine while it was in motion.” Officers Dunn and Calderwood were summoned. They accosted a person, whose identity was never to become known, telling him that they had received a complaint that he was causing trouble. Asked by the officer what the trouble was, the unidentified person said: “I don’t have to tell you nothing.” Asked the same question again by Officer Calder-wood, he gave the same reply which was preceded by lewd language and an obscene epithet directed to the officer. Since women and children were within hearing range, the officer told the person “to watch his mouth”; despite such warning, he again made use of the same lewd language. He was then arrested for causing a disturbance and “for lewd language in front of all these women and children.”
 

 As the prisoner was led to a police car some 40 or 50 feet away, he refused to go willingly and fell to his knees in an effort to break loose. There was a “constant amount of filth coming out of his mouth” and he yelled to a group of onlookers, some 15 in number, to get him away from the officers. When the police car was finally reached, it was surrounded by 150 to 200 persons including McLemore. Both appellants are Negroes. McLemore was yelling: “Kill them white . . . [obscenities], kill them white . . . [further obscenities].” The above expressions were repeated many times.
 

 
 *463
 
 After the prisoner, following a struggle, was finally put in the rear seat of the police car, Officer Dunn endeavored to go around to the other side of the vehicle. The crowd closed in and pushed both officers against the car. MeLemore was shouting: “Let him go,” and “Fight me, [obscenities], fight me, let him go.”
 

 When somebody opened the door of the ear, the prisoner escaped into the crowd. He ran until he was tackled by a Mr. Manley who was visiting the park with his two daughters and a friend. When both got to their feet, Jones appeared out of the thinning crowd and struck Manley with his fist, knocking him to the ground. The prisoner ran back into the crowd, as did Jones. Officer Calderwood struck Jones with his baton; when Jones started to run again, the officer struck him again. Jones continued to run, and Officer Dunn finally tackled him. After Jones was handcuffed, he was taken to the police ear. He then stated: “I hit him because he grabbed hold of me. Ain’t nobody going to grab hold of me and get away with it.”
 

 Meantime, other officers had arrived at the scene. After the police car had taken Jones away, the crowd closed in on the officers remaining, some five in number. These five then formed a circle and tried to get away from the area. Objects, including bottles and cans, were thrown at them. MeLemore threw a bottle; he was seen by an officer who chased the defendant around the merry-go-round and over a chain-link fence. After he had run another 100 yards, the defendant was seized by a citizen who held him until the officer arrived. He was then taken into custody.
 

 Both defendants took the stand. Jones testified that he had gone to the park with his wife and two children. As he started toward the merry-go-round, he saw a small crowd and two police officers with a young man in their custody. Some people rushed in back of him, and he started running with them. He found himself “locked into a circle-like” and “I was arguing with the people to let me out.” As he tried to get out of this circle of people, he was hit on the arm. He turned around and glanced at Officer Calderwood. Calderwood hit him, and he started to run. Calderwood hit him again, and the defendant almost fell. He was then handcuffed and led to the police car. The defendant was bleeding and he “begged” Officer Dunn to loosen the handcuff on his left hand. According to the defendant, the officer laughed and made certain remarks derogatory to the defendant’s race. Upon arrival at the police
 
 *464
 
 station, defendant further testified, Officer Calderwood assertedly interfered with the first-aid treatment he was receiving.
 

 MeLemore testified that on the day in question he had gone to the park with a friend of his “to talk to some girls and have some fun.” While they were talking with some girls on the hill by the merry-go-round, he noticed some young men jumping on and off the machine. He saw the manager object, and he saw the police officers come over and start talking to ‘ ‘ one of the young guys who kept riding on the merry-go-round.” The officers “sort of roughed him up” and took him to the police car. The defendant then walked over to the police car. As he was “bending over and looking” one of the officers grabbed his shirt. He protested and then walked back through the crowd to look for the girls with whom he had been talking. The defendant saw someone throw an object at an officer. Another officer, Officer Blomgren, then came at him. Defendant ran until he was tackled by another Negro. After being taken into custody, Officer Blomgren assertedly told defendant that he could not understand why members of defendant’s race came out to the park when they knew they were not welcome. Finally, he denied that he called the officers any names or that he had shouted at the crowd to take away the other prisoner.
 

 By way of rebuttal, Officer Weil testified to a conversation with MeLemore at
 
 the Hollywood
 
 Station. MeLemore told the witness that two police officers were beating up his buddy near the merry-go-round; that this buddy had once saved his life in a knife fight and that he went to his assistance to demonstrate his gratitude.
 

 The sufficiency of the evidence to support the verdict is not challenged. A reversal is sought, however, because of claimed misconduct by the prosecutor in his opening and closing arguments to the
 
 jury;
 
 it is also contended that the trial court erred in various rulings and displayed prejudice at the time of sentencing.
 

 In his opening argument the deputy district attorney stated: “In this ease there has been an attempt on the part of the defense to show by statements made by Mr. Porter [defense counsel] and questions asked by Mr. Porter, and by what certain of the defense witnesses have said, to show this is all part of a police conspiracy, because the police are angry or mad at the Negro race, and that all of these officers got up here, and this couple of civilian witnesses got up here, and
 
 *465
 
 lied to you as part of this overall conspiracy which is levied against the Negroes.
 

 “I think, ladies and gentlemen, from the testimony you heard from the People’s witnesses, the police officers, and even from the testimony from the defendants themselves, and their witnesses, that there is no showing here that the police in any way attempted to use brutality, use force or to discriminate against anyone. ’ ’
 

 Although no objection was made to the above statements, it is now contended that they unfairly accused the defense of levelling a charge of police conspiracy against Negroes generally. An examination of the record reveals that on at least eleven occasions, by question and answer, defendants attempted to show that they were the victims of race prejudice. This question, of course, entered the trial at an early stage with testimony that the unidentified prisoner (apparently a Negro) had directed obscenities toward the arresting officer as a Caucasian; the officer had been asked by the prosecutor to relate the lewd language used, and no reason is suggested why part of the statement relating to the officer’s race should have been eliminated. A witness has a duty to make answer to questions pertinent to the issue (Code of Civ. Proc., §§ 2064 and 2065); the officer’s answer was responsive to the question.
 

 The existence or otherwise of prejudicial misconduct must always be determined in the light of the particular factual situation presented.
 
 (People
 
 v.
 
 Lyons,
 
 50 Cal.2d 245, 262 [324 P.2d 556].) Since the defense had injected the race prejudice issue to the extent previously mentioned, the prosecution certainly had the right to meet this line of argument under the broad powers given counsel to ‘ ‘ state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.”
 
 (People
 
 v.
 
 Sieber,
 
 201 Cal. 341, 356 [257 P. 64].) Too, even if the reasons advanced by the prosecutor were conjectural, the ultimate questions presented were left to the jury. We see no misconduct as claimed.
 

 In his closing argument, by way of reply to statements made by defense counsel, the prosecutor referred to asserted efforts “to indict the police, the Police Department, for being brutal and being prevaricators, and our way of life. ...” When counsel objected, the trial court told the jury that statements of counsel were not evidence and ‘‘ They can do their own evaluating. ’ ’ The prosecutor then stated: “Well, ladies and gentlemen, when a person will say that a
 
 *466
 
 number of police officers, he indicated Blomgren and Dunn and Weil and certain others, will get up here and prevaricate, and Blomgren, he said, is a smaller Calderwood, I think that is a fair estimate of what he told you but he was trying to bring up that you have got to be sympathetic. You have got to come back with a verdict of not guilty because the Negro Race, as he says, should have more rights, as I understand it, than anyone
 
 else;
 
 and they are not entitled to that. They are entitled to the same rights, that is all, no more and no less.”
 

 No objection was made to the statements just quoted; furthermore, we perceive no impropriety since apparently the remarks resulted directly and naturally from statements made by defense counsel—in that connection, it is not contended that defense counsel did not in substance make the statements attributed to him.
 

 Objection is also made, though not at the trial, to the following remarks: “. . . We should not be forced to be in a position where we cannot enjoy ourselves, where our children—we have to be in fear that something might happen to our children.
 

 “I am not saying this for the fact that there might be a number of Negroes there. I am saying this strictly from the fact that if this type of activity that you heard of exists, if this keeps going on, no one can be safe to go there, and to even enjoy the facilities that they have in Griffith Park.”
 

 As we see it, any reasonably minded juror would interpret this statement to mean that defendants of every race or color should be treated equally under the law. That being so, no prejudice could possibly have resulted.
 

 The final instance of asserted misconduct occurred when the deputy district attorney told the jury that they could find the defendants guilty of riot instead of rescue, the prosecutor contending that riot was a lesser included offense. When objection was made, the trial judge said: “This is simply argument. I am not going to make any statement at the present time which will indicate my own opinion. I will content myself with once again reminding the jury that what counsel says is not evidence.” Upon resuming his argument, the prosecutor stated that “that is my belief as to what the law is, and that is what I believe the Court will instruct you. Of course you are to take the law as the Court tells you, and not what I might say at this time. Anything, again, if the Court should instruct you on the law as to anything that is different from what I say, of course you must disregard what Isay.”
 

 
 *467
 
 It is permissible, of course, for counsel to state what the law is and apply the law to the facts of the case, provided his statement in the premises is correct. The attorney general concedes that no authority has been found to the effect that riot is a lesser included offense to the charge of rescue; however, to constitute misconduct in incorrectly urging a proposition of law, the prosecutor must do so in bad faith.
 
 (People
 
 v.
 
 Gould,
 
 170 Cal.App.2d 489, 492 [338 P.2d 938].) We do not feel that there has been any showing of bad faith here; too, the jury ignored the prosecutor’s argument and found each defendant guilty of only those crimes which each had committed. There is also the further fact of the admonition by the trial judge that the governing law would be given by the court in its charge to the jury. We are not impressed by defendants’ claim that the “constant introduction of the riot issue . . . was also calculated to inflame the jury to a more horrendous picture of the defendants than the prosecution was ready to charge them with directly. ’ ’ Riot is only a misdemeanor, being punishable by imprisonment in the county jail for not more than one year. (Pen. Code, §§ 404, 405.)
 

 Defendants’ next point relates to certain rulings by the trial court—they are eight in number. First, it is claimed that the prosecution should not have been permitted to go into the events occurring at the merry-go-round prior to and following the arrest of the unidentified prisoner. The claim is without merit. The prosecution, as the trial court pointed out, had the right to lay a foundation for the general circumstances preceding whatever else took place; as for the actions of the unidentified person, it was necessary to show that he had been lawfully arrested in order to establish a case of rescue (Pen. Code, § 4550). Second, the trial court properly refused to permit the introduction of a map or diagram of the area which had been drawn by defendants’ counsel. The use of maps and diagrams is proper when they are prepared by a
 
 witness
 
 who is
 
 qualified (People
 
 v.
 
 Kynette,
 
 15 Cal.2d 731, 755 [104 P.2d 794]); too, the right to use this form of evidence is within the sound discretion of the trial judge. (Witkin, California Evidence, §318.) Third, defendants claim objectionable hearsay when testimony was given by the arresting officer as to his conversation with the unidentified person who was later arrested. The latter, as noted earlier, was arrested for using lewd language in front of women and children; since the crime of rescue was charged, it became necessary to establish that the person rescued was
 
 *468
 
 in lawful custody. The situation at bar presents an exception to the hearsay rule, namely, whether certain things were
 
 said or
 
 done—“In these situations the words themselves, written or oral, are ‘operative facts,’ and an issue in the case is whether they were uttered or written.” (Witkin, California Evidence, § 215.) See also
 
 People
 
 v.
 
 Henry,
 
 86 Cal.App.2d 785, 789 [195 P.2d 478].
 

 Also without merit are the remaining claims of error with respect to the trial court’s rulings. It is contended, for example, that the trial court refused to permit a showing that the defendants were unlawfully arrested; however, “even if the evidence had established an illegal arrest the court would not thereby have been deprived of jurisdiction over the proceedings.”
 
 (People
 
 v.
 
 Martinez,
 
 180 Cal.App.2d 690, 692 [4 Cal.Rptr. 829].) As said in
 
 People
 
 v.
 
 Valenti,
 
 49 Cal.2d 199, 203 [316 P.2d 633]: “But a defendant who has been subjected to illegal arrest... should not, by virtue of such illegality, gain immunity from punishment for the offense for which he was arrested. . . .” Furthermore, questions by defense counsel into this phase of the matter either assumed facts not in evidence or called for opinion testimony. Thus, Officer Calderwood was asked whether it was his custom “to sort out people in your police work ... by color ánd race groups”; the trial court correctly held that the question was objectionable: “Custom is not involved here. It is what actually took place.” The rest of defendants’ claims have been examined; their criticisms of the challenged rulings are either lacking in validity or could in no wise have prejudiced the defense.
 

 As their final point, defendants charge that the trial court displayed prejudice at the time of sentencing. A complete answer to this charge is that defendants were granted probation despite an unfavorable recommendation by the probation officer. In the light of such action, any remarks prior to the order (granting probation) that might tend to indicate some prejudice become wholly unimportant.
 

 The judgment (order granting probation) is affirmed.
 

 Wood, P. J., and Fourt, J., concurred.
 

 [1]
 

 Every person who rescues or attempts to rescue, or aids another person in rescuing or attempting to rescue any prisoner . . . from any officer or person having him in lawful custody, is punishable as follows: 1. . 2. If such prisoner was in custody otherwise than as specified in subsection 1 hereof: By imprisonment in the state prison not to exceed five years, or by imprisonment in the county jail not to exceed one year.” (Pen. Code, $ 4550.)