[Crim. No. 10994. First Dist.. Div. Two. Nov. 30, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRELL DEAN MENELEY, Defendant and Appellant.

44

## Counsel

John M. Poswall, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Gloria F. DeHart and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

TAYLOR, P. J.—Defendant, Darrell Meneley, appeals[1] from a judgment of conviction entered on jury verdicts finding him guilty of the mur-

---

[1] As the death penalty was imposed, the notice of appeal was addressed to the Supreme Court which, after its decision in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], transferred the pending appeal to this court.

der (Pen. Code, § 187) of Nancy Breiling, and the kidnaping (Pen. Code, § 207) and assault with a deadly weapon (Pen. Code, § 245) of Linda Houser. He contends that: 1) the consolidation of the Breiling and Houser cases for trial was improper; 2) he was deprived of the effective assistance of counsel by the failure to present the defense of diminished capacity, the failure to object to evidence unlawfully seized at the time of his arrest and the failure to object to Mr. Houser's identification evidence based on an unduly suggestive lineup; 3) his statement was erroneously admitted in violation of his *Miranda* rights; and 4) the prosecution was guilty of prejudicial misconduct. We have concluded that there is no merit to any of these contentions; however, the judgment must be modified to a life sentence.

As there are no contentions concerning the sufficiency of the evidence, a brief summary of the pertinent facts will suffice. Viewing the record most strongly in favor of the judgment, as we must, the following facts appear:

I. The Murder

On Tuesday, October 14, 1969, defendant had been a driver for Bertain's Laundry and Dry Cleaners in Napa for about two weeks. He usually reported for work about 2 p.m. in Napa, loaded his pickup with clean laundry, drove to Fairfield to unload the clean laundry and load his truck with soiled laundry from the company's outlet store, and returned to the plant in Napa about 4 p.m., or shortly thereafter. On October 14, defendant left the outlet store in Fairfield with the soiled laundry about 3:10 p.m.

From about 3:15 to 5:15 p.m., defendant was drinking with his brother Albert in a Fairfield bar about one-half block from Albert's place of employment on Texas Street. As they walked back to the laundry truck about 5:15 p.m., defendant told his brother that the truck had to be back in Napa by 6 p.m.

As he had not arrived at the Bertain plant in Napa by 6:45 p.m., Jean Bertain, the owner, called Harry Foster, defendant's stepfather with whom defendant and his wife lived in Napa. About 7:30 p.m., two other Bertain drivers, Couch and Faulk, searched for defendant, but did not locate him on any of the various routes from Fairfield to Napa.

Just before 6 p.m., the 15-year-old victim entered the Fabric Shop at 838 Texas Street, made a purchase and left the store. One of the victim's teachers, Mr. Maben, saw a Bertain laundry truck in the vicinity of Webster and Empire Streets on October 13, 14 or 15. This intersection was near the Fabric Shop and on the victim's regular route home from school. Maben saw the truck proceeding in the direction away from the school between 4:30 and 6 p.m., or later, with the victim in the passenger seat. The driver

of the truck resembled a former student, Eric Smith, whose photograph was offered in evidence.

The Bertain's laundry truck, identified by Maben, was the one regularly assigned to defendant and driven by him on October 14. The vacant truck was seen parked on the west side of Wooden Valley Road pointing south, just inside the Napa County line, by Mr. and Mrs. Marquez at 6:20 p.m.; about 6:45 p.m. by E. Gregory and D. Woodruff; and about 7 p.m. by L. Capp. About 7:15 p.m., Don McFarland saw the truck on the west side of the road, pointing south, but about one-half mile from the county line. Bertain indicated that there was no reason for any of his trucks to be on Wooden Valley Road as there were no customers in that area.

About 8 p.m., Bertain again called the Foster residence and spoke with defendant's mother. During the conversation, defendant came home. Bertain told defendant to come to the plant to unload his truck. Defendant arrived at the plant about 8:15 p.m. and in response to a question, explained that he had had trouble with the linkage on the carburetor and repaired it. Bertain and Couch noticed that there was no grease on defendant's hands or clothing. After the unloading was completed, Couch drove defendant home about 8:45 p.m. Defendant's wife noticed some mud on the cuff of his brown trousers. Faulk, who drove defendant's truck on the mornings of October 14 and 15, experienced no malfunctions.

Bertain and Couch began to unload the truck in the presence of defendant. They found a pair of women's glasses behind the driver's seat and asked defendant about them. Defendant replied that the glasses belonged to his wife and pocketed them. At the trial, Couch and Bertain each separately identified a duplicate pair of the victim's glasses as those found in the truck rather than a pair of glasses belonging to defendant's wife.

About 11 a.m. on the morning of October 15, the victim's body with a stocking tied around the throat was discovered on an embankment off the west side of Wooden Valley Road, approximately the same location where the witness McFarland saw defendant's truck on the prior evening. The body was in a small wooded area on soil dampened by heavy rains.

The autopsy indicated death by strangulation and a large contusion on the back of the head and skull fracture caused by a tremendous force from a heavy flat object. The pathologist concluded that the victim was rendered unconscious by the blow and was strangled about one-half hour later after being dragged up the embankment. The body remained in the position in which it was found for 12-16 hours following death. The presence of undigested food in the stomach indicated that the victim had died within 4-6 hours after her last meal.

On October 16, 1969, defendant was arrested at the Foster home about 2:45 a.m. in the bedroom he occupied with his wife and advised of his *Miranda* rights. Certain items of his clothing were taken and examined. His shoes had been worn in a damp area; one of them also exhibited Type A blood similar to the victim's. Hair similar to the victim's was found on one shoe and a plaid shirt. A pubic hair of the victim was found behind the driver's seat of the truck. On defendant's Levis there was a fiber that matched the fiber of the victim's dress. Inside the garrote and on defendant's shirt were sinacula seeds. A botanist testified that in the area of Napa and Fairfield, this plant was found only in the area where the body was discovered.

Defendant did not testify in his own behalf. His pathologist expressed the opinion that on the basis of the coroner's report and other data, the time of death was about 11 p.m. on the evening of October 14. Three defense witnesses testified that on the morning of October 15, they were inside a school bus proceeding 15 miles an hour on Wooden Valley Road and did not see the victim's body. However, one of the witnesses who first discovered the body did not initially see it from the roadway.

## II. The Kidnaping and Assault

The victim, Linda C. Houser, testified that about 9 p.m. on September 11, 1969, she left her home at 1550 Laurel Street in Napa to take a walk. After purchasing some cigarettes, she was on her way home on Third Street when a car stopped and a male driver asked her if she wanted a ride. She declined as she did not recognize the driver; the car continued on its way.

Shortly thereafter, she saw a man walking about two blocks behind her. At the intersection of Wilson and Laurel Streets, a man, subsequently identified as defendant, approached, and asked directions to Giovannoni's Market. As she walked to Laurel Street, defendant grabbed her and placed a knife on her jaw, saying, "Shut up. Be quiet or I will kill you." He first led her west on Laurel to Fuller Park, then again west on Laurel towards the park. After defendant complained of stomach pains, the victim (knowing that her parents and sister were home), suggested that he accompany her to her apartment for a cup of tea. Defendant acquiesced, indicating that he was "stoned" on methedrine.

As they arrived at the glass side door of the victim's home, defendant stooped over with an apparent stomach cramp. The victim pushed him, ran into the house and slammed the door behind her. As defendant forced his hand through the glass door, the victim screamed. Her parents were awakened and came to the rescue. Defendant entered the house and then backed

away, knocked down the victim's father, and was thrown to the ground and beaten by the victim's father, but escaped. Subsequently, the victim's father specifically identified defendant at a lineup.

Defendant's mother and stepfather were both awakened by him about 1 a.m. and noted dust on his wrist and arm. The following day, both saw blood and pieces of glass on the floor of the bedroom occupied by defendant and his wife.

Defendant first contends that the court erred in granting the prosecution's motion to consolidate the Breiling and Houser matters. Penal Code section 954, so far as pertinent, provides for the following bases for joinder: "An accusatory pleading may charge two or more different offenses *connected together in their commission*, or different statements of the same offense or two or more *different offenses of the same class of crimes or offenses*, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated" (italics supplied).

For purposes of joinder, offenses are deemed to have been "connected together in their commission" where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims (*People* v. *Polk*, 61 Cal.2d 217, 230 [37 Cal.Rptr. 753, 390 P.2d 641]; *People* v. *Spates*, 53 Cal.2d 33, 36 [346 P.2d 5]). Similarly, within the meaning of section 954, offenses are "of the same class" if they possess common characteristics or attributes (*People* v. *Kemp*, 55 Cal.2d 458, 476 [11 Cal.Rptr. 361, 359 P.2d 913]; *People* v. *Ross*, 178 Cal.App.2d 801, 805 [3 Cal.Rptr. 170]; *Aydelott* v. *Superior Court*, 7 Cal.App.3d 718, 722 [86 Cal.Rptr. 713]).

Defendant first maintains that the Breiling and Houser matters lack a common element of substantial importance. The evidence here adduced discloses (or permits the reasonable inference) that in both the Breiling and Houser matters, the victim was a young woman walking alone, subjected to an assault and kidnaping and taken to a secluded area. It can be reasonably inferred that Miss Breiling, like Miss Houser, was threatened with death. Thus, the statutory requirement of a common element of substantial importance was sufficiently present to permit joinder of the two offenses (*Aydelott* v. *Superior Court, supra*).

In addition, the Breiling murder and Houser kidnaping are "the same class of offense" as required by the statute. Murder is a form of assault and an offense against the person, as is kidnaping. Accordingly, joinder was

permissible on this basis (*People* v. *Kemp, supra; People* v. *Walker,* 112 Cal.App.2d 462 [246 P.2d 1009]).

Defendant maintains that the applicable test is the same as that set forth in *People* v. *Haston,* 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91], relating to proof of prior offenses and that *People* v. *Kemp, supra,* must be overruled to the extent that it is inconsistent with *Haston.*[2] Our Supreme Court recently held that the *Haston* test does not apply where, as here, all offenses are charged[3] (*People* v. *Shells,* 4 Cal.3d 626, 632 [94 Cal.Rptr. 275, 483 P.2d 1227]).

■ As the statutory requirements for joinder were met here, defendant can only predicate error on a clear showing of prejudice (*People* v. *Kemp, supra,* p. 477). Defendant's allegation of prejudice here is based on the fact that the Breiling case was based on circumstantial evidence and the Houser case on direct evidence. He urges that the joinder permitted the jury to infer from the Houser case that defendant was also guilty of the Breiling murder. An identical argument was rejected in *Kemp* where the court found that the defendant had not met the burden of proof as follows at page 477: "The jury was correctly instructed that the evidence applicable to each offense had to be considered as if it were the only accusation before them. It will be presumed that the jury followed that instruction." Likewise, here, the members of the jury swore to consider each offense separately, were properly instructed, and must be presumed to have acted in accordance with their oath and the instructions. We find no abuse of discretion or error in the joinder of the Breiling and Houser matters.

■ Defendant's next contention on appeal is that he was deprived of the effective aid of counsel as his trial counsel failed to: 1) present the defense of diminished capacity; 2) object to the admission of the evidence seized at the Foster home at the time of his arrest; and 3) object to the identification testimony of Mr. Houser based on an unnecessarily suggestive lineup.

Before a judgment of conviction can be reversed on the grounds that trial counsel failed to render effective representation "an extreme case must be disclosed." It must appear that counsel's lack of diligence or competence reduced the trial to a "farce or sham" (*People* v. *Ibarra,* 60 Cal.2d 460, 464

---

[2]The record indicates that the trial court carefully and thoroughly considered this argument before rejecting it and inviting the parties to test it by a writ. Subsequently, this court denied without opinion defendant's petition for a writ of mandate (*Meneley* v. *Superior Court,* Civ. No. 27911) and the state Supreme Court denied a hearing.

[3]The record also reveals that at the same time the court here granted the prosecution's motion to consolidate, it granted the defense motion to quash testimony concerning the uncharged Lounsbury offense, subject to review at trial.

[34 Cal.Rptr. 863, 386 P.2d 487]), and that the representation was in fact "worthless" (*In re Smiley,* 66 Cal.2d 606, 626 [58 Cal.Rptr. 579, 427 P.2d 179]). Without such a showing, counsel is entitled to control the court proceedings and waive his client's rights as to matters of trial tactics (*People* v. *Hill,* 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Merkouris,* 46 Cal.2d 540, 554 [297 P.2d 999]). In light of the foregoing standards enunciated by this court, we examine the three acts of alleged incompetency upon which defendant relies to support his claim of ineffective assistance of counsel.

*Diminished Capacity*

■ Defendant asserts that until the testimony of the defense witness, Dr. Kogl, at the trial, his counsel was unaware of the possibility of a diminished capacity defense, and his failure to raise the defense at the guilt phase constituted ineffective representation.

The record, however, reveals that prior to defendant's plea in either Breiling or Houser, he was examined by Dr. Kogl at the request of defense counsel. On January 9, 1970, defense counsel acknowledged a meeting with Dr. Kogl to discuss the case and requested a continuance for the purpose of considering a dual plea, after receiving Dr. Kogl's written report. The continuance was granted and entry of a dual plea rejected as on January 21, 1970, defendant entered a plea of not guilty to each charge. In *People* v. *Fain,* 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65], where an insanity plea was entered, then withdrawn, and a not guilty plea substituted, a similar claim of incompetency was rejected as follows, at page 600: "Defendant next challenges the competency of his trial counsel. The very transparency of the alibi testimony, the defendant now asserts with the clarity of hindsight, indicates that an alibi defense should have been abandoned. Specifically, defendant charges that the defense should have been centered on diminished capacity, not alibi. It is noteworthy that defendant initially entered a plea of not guilty by reason of insanity; before trial, he withdrew the insanity plea in favor of a not guilty plea. Pretrial psychiatric reports, defendant concedes, revealed the possible presence of a diminished capacity defense. The fact that an insanity plea was entered suggests that a defense structured on defendant's inability to reach the requisite mental state did receive consideration, but counsel ultimately rejected dependence upon that defense. We cannot conjecture, of course, on the reason for this decision. In presenting the defense of alibi, counsel vigorously cross-examined prosecution witnesses, called witnesses on his client's behalf, put defendant on the stand to testify under oath concerning his alibi, and extensively summarized the defense in arguments to the jury. Defendant cannot now be heard to com-

plain because his chosen defense was not successful and his sworn testimony disbelieved. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)"

In addition, the fact that a tactical decision was made here was confirmed by defense counsel's argument during the motion to reduce the death penalty to life imprisonment. Thus, defendant has failed to establish "inadequate representation" as a "demonstrable reality" (*People* v. *Reeves, supra,* p. 774).

Defendant further argues, however, that even if a tactical decision was made to reject the diminished capacity defense, this decision constituted "incompetence as a matter of law." However, the overwhelming weight of authority does not permit such hindsight (*In re Williams,* 1 Cal.3d 168 [81 Cal.Rptr. 784, 460 P.2d 984]; *People* v. *McDowell,* 69 Cal.2d 737 [73 Cal. Rptr. 1, 447 P.2d 97]).

In any event, the record indicates that the defense to the Breiling murder was based on alibi. The uncontroverted evidence established that defendant arrived at the Bertain plant about 8:15 p.m. on the 14th, then was driven home at 8:45 p.m. The defense attempted to establish that the victim was not murdered until 11 p.m. on the evening of October 14, that the body was not placed at the site of discovery until after 7 a.m. on the morning of October 15.

An examination of Dr. Kogl's testimony during the penalty phase indicates that the tactical decision to proceed with a defense of alibi rather than one of diminished capacity was based on the fact that the doctor's testimony was less than convincing and would also result in eliciting facts detrimental to defendant. Dr. Kogl indicated that defendant was suffering from a "paranoid personality," was periodically out of touch with reality, had "confused mental processes," as well as "powerful self-destructive wishes," and suffered from two kinds of blackouts. On cross-examination, the prosecution elicited from Dr. Kogl defendant's explanation of the crimes as follows: As to the Houser kidnaping, defendant stated he had been drinking and taking methedrine, but was not blacked out and "didn't want to kill anybody," but simply wanted "somebody to talk to." In all other respects, defendant's description of the episode conformed to Miss Houser's. As to the Breiling murder, defendant told Dr. Kogl that about two weeks before the murder, defendant ingested large quantities of alcohol and drugs, then blacked out for several days, consumed more alcohol and drugs and was stoned from Saturday, October 11, until his arrest on Thursday, October 16, and remembered nothing about the murder. Dr. Kogl admitted that it seemed unlikely that defendant could have functioned as he did on his job and with his family, while consuming the claimed quantities of liquor and drugs.

We conclude that since the defense knew of Dr. Kogl's prospective testimony prior to the entry of the not guilty pleas to both charges, an informed tactical decision was made to refrain from offering Dr. Kogl's testimony on the defense of diminished capacity during the guilt phase of the trial, as Dr. Kogl's testimony was clearly inconsistent with the pleas of not guilty and alibi defense presented (cf. *In re Saunders,* 2 Cal.3d 1033, 1040 [88 Cal. Rptr. 633, 472 P.2d 921]).

*Search and Seizure of Evidence*

Defendant next complains of his counsel's failure to diligently pursue an objection pursuant to *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], to the admission of the following items of his clothing seized at the time of his arrest: 1) his gold checked shirt from which a sinacula seed was removed; 2) his green Levis from which a fiber of the victim's dress was removed and his shoes from which mud and blood similar to the victim's were removed.

The record indicates that defendant and his wife lived in a jointly occupied bedroom at the home of the Fosters, defendant's mother and stepfather. On the morning of October 16, the officers were admitted to the home by Mr. Foster, and to the bedroom by Mr. Foster and defendant's wife. Defendant was in the process of getting dressed at the time of the arrest; his wife consented to the seizure of the clothing. Defense counsel initially interposed an objection pursuant to *Chimel* to the admission of the clothing, but abandoned it after it was established that defendant was inside the Foster residence at the time of the seizure. Thus, the record, contrary to defendant's assertion, does not establish a clear violation of *Chimel.* Preliminarily, we note that no contentions are made concerning lack of reasonable probable cause to arrest or that the entry pursuant to consent into the home or the bedroom was unreasonable.

As defendant was getting dressed at the time of the arrest, it can be reasonably inferred that the clothing was in "plain view." Thus, the seizure would not violate *Chimel* (*Ker* v. *California,* 374 U.S. 23, 42-43 [10 L.Ed. 2d 726, 743-744, 83 S.Ct. 1623]; *People* v. *Marshall,* 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665]). At the oral argument, defendant, citing *People* v. *Sirhan,* 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121], urged that a limit on the plain view doctrine is that the discovery of the evidence must be inadvertent. However, our Supreme Court noted at page 743 that while this view had been expressed by four U.S. Supreme Court justices (*Coolidge* v. *New Hampshire,* 403 U.S. 443, 469-471 [29 L.Ed.2d 564, 585-586, 91 S.Ct. 2022]), there was no such requirement.

■ In any event, it is well settled that where premises are occupied by more than one person, a search of the portion of the premises jointly possessed is reasonable if consent has been granted by one of the joint occupants who is present at the time of the search (*Frazier* v. *Cupp,* 394 U.S. 731, 740 [22 L.Ed.2d 684, 693, 89 S.Ct. 1420]; *People* v. *Smith,* 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Terry,* 57 Cal.2d 538 [21 Cal. Rptr. 185, 370 P.2d 985], cert. den. 375 U.S. 960 [11 L.Ed.2d 318, 84 S.Ct. 446]). The joint occupant who is present may consent to an entry and search although the person whose property is seized and who also has joint control of the premises is not asked for his consent (*People* v. *Superior Court,* 3 Cal.App.3d 648 [83 Cal.Rptr. 732]) or is not present (*People* v. *Carter,* 48 Cal.2d 737, 746 [312 P.2d 665]).

Here, defendant's wife consented to the seizure of the clothing. Whether her consent was voluntary or whether it was granted in submission to authority was one of fact for the trial court. The evidence indicating that defendant's wife cooperated with the officers supports the trial court's implied finding of consent here (*People* v. *Linke,* 265 Cal.App.2d 297 [71 Cal.Rptr. 371]).

The instant case is clearly distinguishable from *Tompkins* v. *Superior Court,* 59 Cal.2d 65 [27 Cal.Rptr. 889, 378 P.2d 113], where consent was obtained from the joint tenant who was absent from the premises, and the search was conducted over the objection of the other joint occupant who was on the premises.

We conclude that defense counsel's failure to pursue the *Chimel* objection here was not incompetency in the withdrawal of a crucial defense (cf. *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], where no search and seizure objection was ever raised).

### *Mr. Houser's Identification*

■ Defendant asserts that his counsel was ineffective in failing to exclude the evidence of identification by Mr. Houser at an unduly unfair or suggestive[4] lineup, contrary to *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; and *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336].

---

[4]Defendant's contentions must be viewed in this manner as no objection was made to the lineup and the prosecution was not afforded an opportunity to offer evidence on the fairness issue or to demonstrate that Houser's in-court identification had a source independent of the lineup (*People* v. *Fowler,* 1 Cal.3d 335, 350 [82 Cal.Rptr. 363, 461 P.2d 643]).

The record, however, reflects that the only evidence that a lineup had occurred was elicited by the defense on the cross-examination of Houser who stated that prior to the lineup, he was told that a suspect would be in it, that he did not recall "any other redhead" members in the lineup.

The advice that a suspect was in the lineup did not suggest to the identifying witness anything more than he would assume, and in no way suggested that defendant was the suspect rather than one of the other 9 members of the lineup (*Calbert* v. *State* (1968) 84 Nev. 148 [437 P.2d 628]). The isolated fact that Houser did not recall any other redhaired persons in the lineup, of which Houser was uncertain, does not in the absence of evidence as to disparity of height, weight or nationality, justify a conclusion that the lineup was unfair under the "totality of circumstances" standard (*Stovall* v. *Denno, supra*).

Nor can we agree with defendant's assertion that defense counsel should also have examined the victim, Linda C. Houser, to ascertain whether she received any advice similar to that given her father. There was no evidence that the victim ever attended a lineup. In addition, since she was in the presence of defendant for such a long time, a successful attack on her identification was remote (*People* v. *Caruso, supra*). We conclude that defense counsel was not constitutionally ineffective in failing to object to Mr. Houser's testimony on the basis of the lineup. The entire record indicates that defendant received able and effective representation and has failed to sustain his burden of establishing as a demonstrable reality such lack of diligence or competence as to reduce the trial to a farce or sham (*People* v. *Robillard,* 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]).

Defendant further contends that his in-custody statement was erroneously admitted. The record reveals that at the time of his arrest, about 2:45 a.m. on October 16, defendant was advised of his *Miranda* rights and stated that he understood them. He then was taken to the Napa County jail and about 3 a.m. interviewed by Sergeants Lonergan and Narlow and an assistant district attorney. Prior to the admission of this interview, defendant interposed a *Miranda* objection that the court overruled on the basis of the foundation laid.

Sergeant Lonergan then related the following contents of the interview: Defendant described his employment and working hours and that he always used the same route to go back and forth from Napa to Fairfield, Highways 29, 12 and Interstate 80. Defendant also stated that he had never taken the truck to Wooden Valley and wasn't sure where Wooden Valley Road came onto Interstate 80. When defendant was asked where he was on the evening of Tuesday, October 14, he replied: "I think I want a lawyer." At this point,

defense counsel made another *Miranda* objection and was sustained. Thereafter, no further evidence relating to the interview was introduced at the trial.[5]

Defendant first argues that the above evidence should not have been admitted as he was not readvised of his rights at the county jail before the interview commenced. As only 15 minutes elapsed between the initial advice and the interview, no readmonishment was constitutionally required (*People* v. *Johnson,* 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265]; *In re Steven C.,* 9 Cal.App.3d 255, 267 [88 Cal.Rptr. 97]).

Defendant next contends that the admission of the conversation of his request for a lawyer requires reversal pursuant to *People* v. *Andrews,* 14 Cal.App.3d 40 [92 Cal.Rptr. 49]. In *Andrews,* the prosecution elicited from the arresting officer the fact that the accused had refused to make a statement and persistently inquired about the defendant's silence. The court concluded, at page 48, that "the prosecutor had embarked on a calculated effort to convert the defendant's silence into a tacit admission of guilt."

No similar pattern of conduct by the prosecution appears in this record. The witness was simply asked "What did you say—what did he say"; there was no attempt to persuade the jury by the use of deceptive or reprehensible methods (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]). The jury was also instructed as to the constitutional right to an attorney and that no inference concerning guilt could be drawn from the assertion of this right. Further, defense counsel made no effort to prevent any reference to defendant's request or seek an admonition from the court (*People* v. *McGautha,* 70 Cal.2d 770 [76 Cal.Rptr. 434, 452 P.2d 650]; *People* v. *Asta,* 251 Cal.App.2d 64 [59 Cal.Rptr. 206]).

Finally, we turn to defendant's contention that the prosecution was guilty of several acts of prejudicial misconduct.

Preliminarily, we note that a claim of prosecution misconduct must be assessed in light of three well-established legal principles. The first, procedural in nature, is well stated in *People* v. *Ney,* 238 Cal.App.2d 785, 790-791 [48 Cal.Rptr. 265]: "Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. [Citations.] Subject to the foregoing two exceptions,

---

[5]Defendant in his brief argues on the basis of the entire interview which was recounted only at the preliminary examination.

it is the general rule that error predicated on the alleged misconduct of the prosecutor cannot be raised on appeal in the absence of (a) an assignment of such misconduct as error and (b) a request to the trial court to instruct the jury to disregard it. A mere objection to the allegedly prejudicial statements without a request to the court to instruct the jury to disregard them is ordinarily insufficient to raise the question of misconduct on appeal. [Citations.] 'Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.' [Citations.]"

The second inquiry, substantive in nature, requires a resolution of whether the conduct complained of is in fact "misconduct," which "implies a dishonest act or an attempt by an attorney to persuade the court or jury by the use of deceptive or reprehensible methods" (*People* v. *Beivelman, supra,* p. 75).

Finally, assuming the issue is properly before the court and in fact constitutes "misconduct," the judgment will not be reversed unless, after a review of the entire cause, it appears that it is "reasonably probable" that a result more favorable to the defendant would have occurred had the district attorney refrained from the misconduct in question (*People* v. *Beivelman, supra,* p. 75; *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243]; *People* v. *Brajevich,* 174 Cal.App.2d 438, 447 [344 P.2d 815]). If it is asserted that the alleged misconduct is of constitutional dimensions, it need only be clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed. 2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]). In the light of the above rules, we examine the alleged acts of misconduct assigned by defendant.

 He first complains that a violation of *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], occurred in the following statement made during the prosecution's opening argument: "Mr. Lonergan will also tell you that he attempted to interrogate Mr. Meneley the night he was arrested. Mr. Meneley said very little, and denied ever being in Wooden Valley." No objection was made to this comment at the trial and no admonition requested (*People* v. *Hardeman,* 244 Cal.App.2d 1 [53 Cal.Rptr. 168]).

The statement cannot reasonably be construed as a comment on defendant's silence following arrest in violation of *Griffin* (cf. *People* v. *Modesto,* 66 Cal.2d 695, 711 [59 Cal.Rptr. 124, 427 P.2d 788]). Even if so, the jury was expressly instructed as to the constitutional right to silence; and in view of the overwhelming evidence against defendant, it is clear beyond a reasonable doubt that the statement did not contribute to the verdict on the murder charge (*Chapman* v. *California, supra*).

 Defendant next argues that the prosecutor disparaged the role of defense counsel by the comments set forth below.[6] The record indicates that in only one instance was an objection registered, and the jury admonished as follows: "THE COURT: Let me say this. Statements made by attorneys during the argument is [sic] not evidence. Both counsel are permitted to paint any inferences that they believe the evidence shows.

"I didn't construe the District Attorney's remark as indicating that he accused the defendant of trying to deliberately mislead the jury. If that be the inference, I would admonish the jury not to consider that as a factor in the case."

We think these comments were entirely within the range of proper comment by the prosecution on the evidence and credibility of witnesss, merits of the defense, and to argue all reasonable inferences (*People* v. *Washington,* 71 Cal.2d 1061 [80 Cal.Rptr. 567, 458 P.2d 479]; *People* v. *Eggers,* 30 Cal.2d 676 [185 P.2d 1]).

 Defendant next asserts that the prosecution disparaged the defense witness, Dr. Holloway, by the following: "It is interesting to me, and I think you have to consider this, of course he is a defense witness, and he is obviously going to testify as favorably as he can under the objective evidence in favor of the defense; again there is nothing wrong with that . . ." Again, no objection was made. We conclude this was a permissible argument from the fact of employment (*People* v. *Washington, supra,* p. 1086; *People* v. *Varnum,* 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553]).

 Nor is there any merit in defendant's next contention that the prosecution's comment that the evidence failed to establish that defendant did not commit the crimes charged also constituted an implied violation of the *Griffin* rule. It is well settled that *Griffin* does not extend to comments on

---

[6]"So I don't know why the defense can't be honest with you. And I think that is something that you should evaluate when you do discuss the defense case."

"Then it becomes the burden and the duty of the jury to decide where the truth is. I didn't mean anything personal when I used the term that he is trying to throw 'dust in your eyes.' That is his job. He is doing an excellent job. Mr. Lyons is an excellent attorney. My warning to you is not to let that dust get in your eyes. And that is what I am trying to prevent. That is what my job is to do, is to prevent."

"Don't let that dust get in your eyes. That is what I mean when I use that term. I will probably use it again, one of my favorite terms. I don't mean anything personal about it. But it is my duty to point out to you the obvious attempt to mislead the jury. If he can get away with it, fine. Perfectly legal, perfecly ethical, and part of the duty of defense attorney."

"In other words, whichever way we jump, we are wrong on that particular thing. Don't let that particular type of dust get in your eyes."

"Of course, again Mr. Lyons throws a lot of dust around, and again, you know, you can't try the law, you can't try the facts, you try the police."

the state of the evidence or on the failure of the defense to introduce material witnesses or to call logical witnesses (*People* v. *Hardy,* 271 Cal.App.2d 322, 331 [76 Cal.Rptr. 557]; *People* v. *Grant,* 268 Cal.App.2d 470, 475 [74 Cal.Rptr. 111]). Again, no objection was made or admonition requested. In any event, the jury was properly instructed on the burden and degree of proof and the presumption of innocence.

Defendant next cites as prosecution misconduct an alleged misstatement of law (in the closing argument) that defendant was bound by the testimony of his wife indicating that the blood on his shoes was not hers, as she was a defense witness. No objection was made. The record indicates that defendant's wife was first called by the prosecution after waiving her marital privilege. At the time of trial, she had filed for dissolution of the marriage. Defendant correctly asserts that the prosecution's comment was contrary to the fact, as Evidence Code section 785, effective January 1, 1967, abolished the presumption that a party is bound by the testimony of his witnesses (*People* v. *Chacon,* 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]).

However, a prosecutor is not guilty of misconduct because in his argument of the law to the jury, he is wrong as to the law. Misconduct occurs only where an erroneous proposition of law was argued in bad faith (*People* v. *Calpito,* 9 Cal.App.3d 212, 222 [88 Cal.Rptr. 64]; *People* v. *Jones,* 205 Cal. App.2d 460 [23 Cal.Rptr. 418]). Clearly, there was no bad faith here. At most, there was an insignificant misstatement of law.

Defendant next asserts that the prosecution on several occasions invited the jury to compare the Houser and Breiling cases and rely upon the kidnaping-assault to find defendant guilty of the murder. As no objection was made to the first two, we need not discuss them under the authorities cited above.

As to the third alleged act of misconduct, the record indicates that after the prosecutor commented on the sufficiency of the evidence in the Houser case, he continued as follows: "So ladies and gentlemen, when you are through discussing this case, and I am sure that you will consider each case separate as the Judge will instruct you, and I leave it to you, which case you start with first. The Houser case I think is basically simpler, and I think that it might be more logical for you to start with that.

"If you follow my reasoning on the lack of evidence on the Houser case, when you do start discussing the Breiling case I am sure that it will occur to you that when you really get down to the essential elements of that case, and consider what the People have proven and weigh it against the defense wit-

nesses and his objective testimony, when you really get right down to it, what I have said about the Houser case also applies to the Breiling case."

Defense counsel immediately objected and indicated he wished to make a motion out of the presence of the jury. The court sustained the objection and admonished the prosecution and the jury: "Do not refer to the cases together in either manner. Each case is to be considered separately by the jury. The two cases are consolidated merely for the purpose of convenience. The jury is directed to consider the case on each case with its own merits, and not with regard one to the other." Thereafter, the defense motion for mistrial was denied and we think properly. The gist of the prosecution's remarks was that the same analysis of the evidence was to be applied to each case and within the scope of proper comment (*People* v. *Hardy, supra,* p. 332). In any event, the court's admonition was entirely adequate.

Defendant also contends that the prosecution argued facts outside the record concerning the trail of blood leading away from the Houser residence. According to the testimony, this trail, at one point, passed along the sidewalk across the street from the front door of the sheriff's office. In closing argument, the defense argued that the trail passing so close to the front of the sheriff's office was inconsistent with a theory of escape by an alleged assailant. In rebuttal, the prosecutor stated "No one uses the front entrance" of the sheriff's office and that it is "common knowledge, I am sure you all know that" the officers "come out of the back part of the sheriff's office." There was no evidence concerning which door was used more frequently, the defense objection was sustained, and the court admonished the jury of the absence of evidence in this regard.

Here, likewise, the erroneous reference to the usage of the doors to the sheriff's office was the result of inadvertence or honest mistake rather than a dishonest act or attempt to persuade the jury by deceptive or reprehensible means (*People* v. *Graves,* 263 Cal.App.2d 719 [70 Cal.Rptr. 509]). In any event, in view of the overwhelming evidence against defendant in the Houser case and the trial court's admonition and instruction that arguments of counsel were not evidence, it cannot be said that in the absence of the prosecutor's remark, a result more favorable to defendant was reasonably probable (*People* v. *Sawyer,* 256 Cal.App.2d 66, 69 [63 Cal.Rptr. 749]; *People* v. *Watson, supra*).

For the reasons stated above, we conclude that there is no merit to any of the claims of prosecution misconduct.

In view of *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (decided Feb. 18, 1972), we need not discuss defendant's contentions concerning the constitutionality of the death penalty, *Witherspoon*

and other alleged errors during the penalty phase of the trial. On the authority of *People* v. *Anderson, supra,* page 657, the judgment, insofar as it provides for the penalty of death, is modified to life imprisonment and as modified, is affirmed in all other respects.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied December 29, 1972, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied January 24, 1973.