[Crim. No. 14642. First Dist., Div. Two. May 17, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
GORDON MICHAEL HEIDEMAN, Defendant and Appellant.

## COUNSEL

Henry P. Schroerluke, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, P. J.**—Defendant appeals from a judgment entered on a jury verdict finding him guilty of possession of a destructive device in a "specified place" (Pen. Code, § 12303.2).[1] He contends that: 1) the judgment was void on its face; 2) the court erred in instructing the jury as to the elements of Penal Code section 12303.2 and refusing his proffered instructions; 3) there was no evidence that he possessed a destructive device as he did not have the blasting caps necessary to set off the dynamite; 4) the destruction of the dynamite by the police for reasons of

---

[1]Although defendant was also found guilty of unlawful possession of an explosive, dynamite (Health & Saf. Code, § 12305), his appeal is confined to the issues presented by the verdict as to count II of the indictment and Penal Code section 12303.2. The record also indicates that defendant was found not guilty of violating Penal Code section 12303.3.

public safety violated his right to a fair trial; 5) the prosecution committed prejudicial misconduct in telling the jury that he had admitted possession of a destructive device; and 6) the punishment of five years to life imposed on him was cruel and unusual because he intended only to defraud and not to injure. For the reasons set forth below, we have concluded that there is no merit to any of these contentions and that the judgment must be affirmed.

As there are no direct contentions concerning the sufficiency of the evidence, a brief summary of the pertinent facts, as revealed by the record, and aptly set forth in the People's brief, will suffice.

About 10:30 p.m. on March 30, 1975, Greg Collinson entered Harold's Club in Santa Clara County and talked to a friend named Danny, who related that several nights earlier, someone had fired gunshots at his massage parlor. Another friend of Collinson, D. Grant, approached the two men as they were talking and continued to talk with Collinson after Danny left. While Collinson related the gunshot incident to Grant, defendant entered the conversation.

Eventually, defendant and Grant asked Collinson to accompany them to their room at the nearby El Rancho Motel. Defendant told Collinson that he was going to Canada and needed $20,000 to secure the release of his partner who was in jail in Phoenix, Arizona. To obtain this amount, defendant planned to fulfill three or four murder "contracts" at $5,000 each.[2] Defendant indicated to Collinson that he had sufficient explosives to commit the murders, or could use a firearm, if the explosives proved inconvenient.

Defendant then asked Collinson whether his friend Danny wanted revenge for the shots fired at the massage parlor. Defendant promised Collinson $800 of the $5,000 fee after the latter promised to check with Danny. Defendant also told Collinson that he would give him 40 percent of any other contracts that Collinson could arrange. During this conversation, defendant produced two or three sticks of dynamite and explained that he could wire them, attached to a mercury switch, to the car of a victim. Defendant indicated that he had brought the explosives from Arizona by bus to avoid detection. Defendant did not display the

---

[2]We may take judicial notice of the fact that the term is commonly used to refer to a hired killer (Evid. Code, § 459; *People* v. *Hubbard*, 9 Cal.App.3d 827 [88 Cal.Rptr. 411]).

mercury switch, any blasting caps, or his revolver[3] during his encounter with Collinson.

Collinson left the room, promising defendant that he would contact him if he found someone who needed his services. Collinson definitely felt that defendant was serious because of the "cold-blooded way in which he conveyed the information;" defendant impressed Collinson as a "cold-blooded killer." After "weighing the different possibilities" for several days, and fearing that defendant would "indiscriminately [blow] up people around Santa Clara County," Collinson on April 3 contacted Sergeant Kelso of the Mountain View police. Kelso instructed Collinson to arrange for a meeting between defendant and someone ostensibly looking for a "contract" killer. Collinson then telephoned defendant at the El Rancho Motel to tell him that a man would contact him about 5 p.m. to arrange for the murder of his partner. Defendant was enthusiastic that Collinson had been able to find a "client" in need of his services.

Officer Vierra of the Palo Alto Police Department received the above information about defendant from Kelso. Vierra telephoned defendant at the motel, introduced himself as Michael Thompson, and arranged to meet defendant at 5:30 p.m. at Harold's Club. At the appointed hour, defendant and Vierra met in the club and sat alone at a table, while four detectives were at various locations in the bar.

Vierra explained that one "Ralph Caldeen" had stolen several thousand dollars from him and that he wanted revenge. When Vierra appeared apprehensive, defendant assured him, indicating that he had three years' experience, was reliable, and had been taught how to use explosives by a friend who served in Vietnam; he also gained experience in Chicago working for several Mafia families. Defendant told Vierra that he used explosives because bombs, unlike guns, could not be traced and explained that he purchased his dynamite in Arizona and his fuses in Oregon.

When questioned as to how he planned to carry out this contract, defendant replied that he would wire dynamite to the victim's car; as the car begins to move, the dynamite explodes and kills the driver. Defendant's price was $5,000, with $2,000 in advance. Defendant also told Vierra that he needed $10,000 to pay for a friend's legal expenses. Defendant then obtained from Vierra detailed information concerning

[3]According to defendant, a silencer was affixed to the revolver which was concealed in a briefcase.

the habits of the intended victim, and instructed Vierra to leave town for the three days during which defendant would commit the murder.

Defendant then took Vierra to his room to show him the bomb. Defendant demonstrated the device, activating a flash bulb in lieu of the stick of dynamite that had been wired to the bomb, and displayed another stick of dynamite that he kept in his suitcase. Defendant told Vierra that he kept the blasting caps separate from the dynamite.

The two men then returned to Harold's Club where defendant asked Vierra to write all of the pertinent information concerning the intended victim on a slip of paper. Defendant copied this information and returned the first piece of paper to Vierra, and explained that he did not want to have in his possession a note in Vierra's handwriting. Vierra promised defendant the downpayment of $2,000 on the following day and indicated he would spend three days at Lake Tahoe and then return to pay the balance of $3,000 after the murder had been completed. Defendant asked Vierra for $100 to permit him to hire a prostitute to use as a "cover" while he observed the victim. Vierra, however, indicated that he was unable to provide this amount as he had only $15.

Thereafter, about 6:35 p.m., Vierra arrested defendant and Grant, who had recently arrived. After each was advised of his rights, each consented to the search of his room. Sergeant Timmons, a "bomb technician" from the county sheriff's office, entered defendant's room and found what he described as the well constructed "makings of a bomb—a stick of dynamite with four batteries, mercury switch, and wiring." Neither Timmons nor Vierra was able to find any blasting caps in defendant's room; defendant did not have a permit authorizing the possession of dynamite.

Timmons noticed that the dynamite was beginning to "sweat" (i.e., the nitroglycerin was beginning to separate from the binding material and seep through the paper wrapping) and that the label on the sticks indicated an age of two years. As Timmons did not believe that dynamite should be kept longer than six months and there was the beginning of decomposition, Timmons concluded that the two sticks of dynamite found in defendant's room were safe only if handled carefully and could be detonated accidentally without a blasting cap. Accordingly, Timmons disposed of the explosive.

Defendant, testifying in his own behalf, indicated that he had come to California from Phoenix with Paul Robino in a pickup truck to avoid his own financial, marital and legal difficulties. Defendant planned to join his brother in Vancouver. Before he left, defendant, on an impulse, stole the two sticks of dynamite from the home of a friend where he had been staying.

Defendant and Robino arrived at Grant's home in Mountain View about 3 a.m. on March 30, 1975. Defendant had known Grant in Phoenix and had last seen him about six weeks earlier. Grant was not at home but his brother and sister permitted defendant to sleep there that night. Later that morning, Robino drove defendant to the Greyhound bus station in San Francisco, as defendant planned to take the bus to Vancouver. However, since defendant arrived too late for the scheduled departure, he and Robino returned to Palo Alto. Defendant then planned to take a later bus and wanted to rest before returning to the bus station, and found Grant in a card room in Palo Alto. Grant arranged for defendant's room at the El Rancho Motel. Exhausted from his journey, defendant slept there from 2 p.m. to 9:30 p.m.

After he woke up, defendant went to Harold's Club where he found Grant in conversation with Collinson. A fourth man named Don soon joined them in the foyer of the club. All four then went to Grant's room where Grant, Collinson and Don injected themselves with narcotics. Collinson then engaged defendant in conversation and sought to sell him some stolen clothing. Defendant declined this offer and showed the sticks of dynamite to Collinson. After Grant volunteered the information that defendant was a professional killer, Collinson showed interest. Defendant embellished the story, indicating that he could blow up buildings and had a gun with a silencer in his briefcase.

After Collinson and Don left, defendant and Grant decided that they could financially exploit their story of defendant's "occupation" by offering defendant's services as a killer, collect downpayments from "clients," and then leave for Canada. As these prospective "clients" would not report the proposed thefts of the downpayments to the police, defendant and Grant would not be prosecuted. Using a fictitious name, defendant then purchased the materials for the bomb that he would use to convince his "clients" that he was a professional assassin. Defendant had constructed the bomb before he received Collinson's telephone call on April 3 because he relied on Collinson's promise that he would find a "client." Defendant bought no blasting caps because he did not intend to explode the device or to injure anyone.

Despite his representations to Vierra, defendant, in fact, had never murdered anyone; nor had he worked for the Mafia in Chicago. Defendant showed the second stick of dynamite to Vierra to convince him of his sincerity and copied Vierra's information about the victim on a separate sheet of paper to "add intrigue;" to add realism, he told Vierra to establish an alibi. Defendant admitted that he had no permit authorizing him to own or possess dynamite, as required by statute. (Health & Saf. Code, § 12303).

Keith Britton, the president of a corporation that manufactures explosives, testified that the two-year-old dynamite was still safe on the basis of a photograph of the dynamite possessed by defendant and taken prior to its disposition by Timmons. Britton characterized defendant's bomb as "highly amateur," revealing that its maker had little knowledge of explosives. For example, the bomb had four times the battery power necessary to detonate it; thus, because of the way that the dynamite was mounted, four-fifths of the energy would be wasted upon detonation. In addition, the whole device was too large and conspicuous. The attached mercury switch was "very professional" but not suited to the device, as after the explosion, the components would not be totally destroyed and could be traced.

The pertinent statutory provisions are: Penal Code section 12303.2: "Every person who recklessly or maliciously [4] has in his possession any destructive device or any explosive on a public street or highway, in or near any theater, hall, school, college, church, hotel, other public building, or private habitation, in, on, or near any aircraft, railway passenger train, car, cable road or cable car, vessel engaged in carrying passengers for hire, or other public place ordinarily passed by human beings is guilty of a felony, and shall be punishable by imprisonment in the state prison for a period of not less than five years."

Preliminarily we deal with the contentions that the portion of the judgment here in issue was void and that the verdict was defective. Defendant argues that the judgment was void as it stated only that he was convicted of "Possession of Destructive Device in a Specified Area," in violation of Penal Code section 12303.2.

---

[1] The record indicates that count II charged defendant not in the language of the statute but conjunctively with "recklessly *and* maliciously" possessing a "destructive device *and* explosive."

*People* v. *Ihm,* 247 Cal.App.2d 388 [55 Cal.Rptr. 599], held at page 393: "When the judgment record, by reference to the indictment, information or complaint, to which reference is specifically made, sufficiently shows the offense of which a defendant has been convicted and for which he is sentenced, the reference to or description of the offense is sufficient, and the defendant is not prejudiced by inaccurate statements with relation thereto, and the judgment is not void on that account. (*People* v. *Becker,* 80 Cal.App.2d 691, 695 [181 P.2d 958].)" An order for the correction of such an error may be made by a reviewing court (*People* v. *Crittenden,* 14 Cal.App.2d 589, 593 [58 P.2d 680]). ▮ The judgment here by the specific reference to the statute sufficiently described the offense and can easily be corrected to read possession of a destructive device in a public building.

Defendant next argues that *People* v. *Ihm, supra,* is not controlling as that case dealt merely with a technical error in the judgment, while here the judgment did not sufficiently comport with the verdict that was in itself defective. We turn, therefore, to his contentions urging that the verdict was defective as it lacks the requisite unanimity and specificity as to which of the three acts proscribed by Penal Code section 12303.2 he committed, as well as to the necessary mens rea. ▮ The contentions as to specificity are entirely without merit as the evidence indicated that defendant possessed the dynamite in a motel. Thus, the portion of the statute that refers to "possession . . . in or near . . . any hotel" most closely fits the motel, although arguably it is located on a public street, and is a public place ordinarily passed by human beings. The record indicates that defendant was charged with possession in a hotel and that the jury was instructed that a motel was a hotel within the statute. Further, defendant admitted the possession of the dynamite in the motel on the date charged.

▮ Nor under the circumstances of this case was it necessary that the jury determine whether defendant was in possession of "any destructive device or any explosive." The uncontradicted evidence indicated that defendant on April 3, 1975, displayed to Vierra the "bomb" that he had constructed and the second stick of dynamite that he concealed in his suitcase. If any of the jury found that he possessed a "destructive device," it was because of the presence of the dynamite, an explosive; thus, these jurors necessarily found that he possessed an explosive (cf. *People* v. *Miller,* 43 Cal.App.3d 77, 84 [117 Cal.Rptr. 491]). Further, given defendant's uncontroverted admission of possession, it was not necessary to instruct the jury to agree which one of the specific items he

possessed "so long as they all agreed at the time and place he possessed, separately, jointly or constructively," an explosive (*People* v. *Wright,* 268 Cal.App.2d, 196, 198 [73 Cal.Rptr. 692]).

■ As to the requirement of unanimity, we adopt the well reasoned position of the People in their brief, with appropriate editorial modifications: If a defendant has been prosecuted for violation of a statute under which any one of several different acts could constitute the offense, the jury must be told that a verdict of guilty must be supported by a unanimous finding that one of the acts was committed (see *People* v. *Failla,* 64 Cal.2d 560, 568 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Scofield,* 203 Cal. 703, 709, 711 [265 P. 914]; *People* v. *Dutra,* 75 Cal.App.2d 311, 321-322 [171 P.2d 41]). However, this principle is plainly inapplicable to the case at bar because defendant committed only *one* continuous act of possession (see *People* v. *Wright, supra.*)

■ There is no merit to the argument that the jury should have been instructed to agree unanimously about defendant's mens rea before finding him guilty. In the context of the offense charged, a person who possesses an explosive either maliciously or recklessly is equally culpable because in either case he creates an unacceptably high risk of harm to the community.

An apt analogy is presented by cases involving murder, theft and burglary. A defendant may be convicted of murder of the first degree without unanimity of agreement on one of several theories advanced by the prosecution. Thus, some jurors may find that the murder occurred during the course of a felony; others may find that it was deliberate and premeditated (see *People* v. *Milan,* 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Nye,* 63 Cal.2d 166, 173 [45 Cal.Rptr. 328, 403 P.2d 736], cert. den., 384 U.S. 1026-1027 [16 L.Ed.2d 1033, 86 S.Ct. 1696]). Nor is it required that jurors decide what felony a burglar intended at the time of his entry (*People* v. *Failla, supra,* at p. 568), or whether a theft was a common law larceny or false pretenses (*People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897]).

Similarly, in the instant case, unanimity on theory is immaterial because the defendant posed a threat to society that does not vary or increase in relation to the intent he entertains. A burglar who enters a building intending to commit rape creates a risk of harm equal to that of an intruder who intends to steal. One who commits a murder with premeditation represents a danger on a par with that of a robber who has

killed during the course of his crime. Similarly, one who recklessly possesses explosives presents as great a threat to the community as one who maliciously possesses the forbidden material. Accordingly, we conclude that the requirement of unanimity was met here.

As indicated above, defendant's major contentions on appeal concern errors in the instructions as to the mens rea element of Penal Code section 12303.2. The record indicates that as to the charge, the jury was instructed in the conjunctive language of the information, rather than the disjunctive words of the statute.[5] As to the statute, however, the jury was correctly instructed in the disjunctive. In addition, defendant's requested instructions 3 and 4, defining reckless as meaning more than negligence, as set forth below,[6] were refused. Also, over defense objections, the jury was instructed (No. 23a), as indicated below, concerning the definition of recklessness[7] and malice (No. 22).[8] The court also refused defendant's requested instruction No. 5.[9]

The People concede the error in the instruction that failed to indicate that recklessness requires a conscious disregard of probable consequences, but argue that the error was harmless pursuant to *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]. ■ We agree with the People's contention. Defendant's own testimony establishes a mens rea higher than recklessness. He testified he stole the dynamite and possessed it without a permit. The court properly instructed that lawful possession required a permit pursuant to the conditions prescribed by Health and Safety Code section 12303 and that malice meant an intent to

[5]Count II: "That in the County of Santa Clara, State of California, on or about the 3rd day of April, 1975, the said defendant committed a Felony, to wit: A violation of California Penal Code Section 12303.2 (POSSESSION OF DESTRUCTIVE DEVICE IN A SPECIFIED AREA), in that the said defendant did recklessly *and* maliciously have in his possession a destructive device and explosive in or near a hotel." (Italics ours.)

[6]" 'Recklessness' is more than mere inattention, carelessness, or the failure to use ordinary care. To be reckless, the defendant's conduct must be aggravated, gross, and such a departure from the conduct of an ordinarily prudent man as to be contrary to a proper regard for human life or an indifference to consequences."

"A person acts 'recklessly' when he intentionally does an act of an unreasonable character in disregard of a risk, known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

[7]"Recklessly means not recking, careless, heedless, inattentive, indifferent to consequences. . . ." This definition was based on Black's Law Dictionary.

[8]"The words 'malice' and 'maliciously' mean a wish to vex, annoy or injure another person, or an intent to do a wrongful act."

[9]"As used in this definition, the term 'wrongful act' does not include an attempt to defraud a person."

do an unlawful act. *Defendant admitted that his purpose in storing the dynamite in his room was to carry out a nefarious scheme to defraud his victims.* ■ In view of the inherently dangerous nature of an explosive substance and the public places in which the statute prohibits possession, we do not interpret "maliciously" within the terms of the statute to require an actual *intent* to physically injure, intimidate or terrify others.[10] Thus, we conclude that the record clearly establishes by uncontradicted evidence that there was here the malice proscribed by Penal Code section 12303.2.

Defendant next contends that there was no substantial evidence that he possessed either a bomb or a destructive device because no blasting caps necessary to detonate the dynamite were found.

The term "destructive device" includes, inter alia, "[a]ny bomb, grenade, explosive missile, or similar device . . ." (Pen. Code, § 12301, subd. (a)(2).) Defendant argues that he had no blasting caps with which to detonate the dynamite and that if the mere intentional possession of dynamite or other explosive device is proscribed by the statute, the proscription of possession of an explosive is superfluous. He assumes, however, that the Legislature intended to prohibit only the possession of substances and devices that are immediately capable of exploding and had no concern with explosives or devices that can be detonated only with the introduction of a blasting cap. In sum, he urges that it is lawful under Penal Code section 12303.2 to possess a bomb without a blasting cap. ■ This contention is entirely without merit and contrary to the clearly expressed intent of the Legislature.

The definitions of Penal Code section 12301, subdivision (a)(2), were changed in 1970 (Stats. 1970, ch. 771, § 4, p. 1457) at the same time when Penal Code section 12303.2 was added (Stats. 1970, ch. 771, § 5, p. 1457, effective Aug. 19, 1970), as a part of a comprehensive scheme of urgency legislation[11] to conform to the legislative intent. Defendant's argument

---

[10]This interpretation is consonent with the harmony of the statutory scheme as Penal Code section 12303.2 proscribed a different series of offenses than section 12303.3.

[11]Section 12303.3 was also added by Statutes of 1970, chapter 771. Both of the statutes were also in substantially identical or similar form included in but excepted from Statutes of 1970, chapter 1425 (by §§ 37 and 38 at p. 2726). They were enacted as emergency legislation in a separate bill that became effective prior to September 18, 1970, the effective date of the rest of the statutory scheme of regulation of explosives of Statutes of 1970, chapter 1425, whose intent was "to provide greater security and control over explosives which might wrongfully become available to persons intent on using such explosives for illegal purposes. . . ." (Stats. 1970, ch. 1425, § 40, p. 2726.)

overlooks this clearly stated legislative intent, as well as the testimony of Timmons that in his view, the dynamite found in defendant's room, because of its age and stage of decomposition, could be detonated accidentally without a blasting cap.[12]

Defendant's next contention that to sustain the judgment we have to hold that the statute proscribes the intentional innocent possession of dynamite or other devices without immediate possibility of explosion, is patently without merit. Defendant concedes that the dynamite found in his room was an explosive and the jury was so instructed pursuant to Penal Code section 12301, and Health and Safety Code section 12000, subdivision (a). As indicated above, the jury was also instructed that the lawful possession of dynamite and explosive materials required a permit that defendant admittedly did not have. Further, the Legislature clearly stated the purpose of the statutory scheme in the 1970 legislation was to provide greater security and control over explosives, such as dynamite, that might wrongfully become available to persons intent on using them for illegal purposes. Thus, section 12303.2 proscribes the reckless or malicious possession of explosives in public places; section 12303.3[13] proscribes the possession, explosion, or attempt to explode with the described unlawful specific intent. Defendant here admitted that he possessed for use the sticks of dynamite in the motel, a public place, on the date in question. Nor can he argue that his intent to possess it was entirely innocent in the absence of a permit and his admission that he wanted to use the dynamite for a criminal scheme. ■ Thus, there is no question that there was ample substantial evidence to support the verdict on that count.

We turn next to the contention that the destruction of the dynamite deprived defendant of a fair trial. He argues that the destruction constituted bad faith and suppression of evidence vital to his defense, as a laboratory examination of a retained sample would have demonstrated that the explosive device and dynamite were as safe as the defense expert indicated. ■ The evidence, however, indicates that Timmons, the bomb technician of the county sheriff's office, destroyed the dynamite

[12]The conflict in the evidence presented by the testimony of the defense explosive expert who considered the dynamite still "safe" was for the jury to resolve.

[13]The record indicates that defendant was also charged with, but found not guilty, of violating Penal Code section 12303.3, which provides: "*Every person who possesses,* explodes, ignites, *or attempts to explode* or ignite *any destructive device* or any explosive *with intent to injure, intimidate, or terrify any person, or with intent to wrongfully injure or destroy any property,* is guilty of a felony, and shall be punished by imprisonment in the state prison for a period of not less than five years." (Italics supplied.)

because he feared that due to its age and stage of decomposition, it could explode without any detonating caps. The destruction of the evidence because of Timmons' good faith belief in the potential danger to the community, also did not deprive defendant of the defense that the dynamite in question was safer and far less volatile than Timmons thought, since the defense explosive expert, Britton, so testified. Furthermore, we note that the statutes make no distinction between the possession of stable and presumably "safe" dynamite and the possession of unstable and presumably dangerous dynamite (Health & Saf. Code, § 12000, subd. (a)). Accordingly, the destruction of the dynamite by Simmons was not prejudicial to defendant (*People* v. *Kidd,* 56 Cal.2d 759 [16 Cal.Rptr. 793, 366 P.2d 49]) and was well within the authorities permitting law officers in good faith to destroy or dispose of evidence in accord with police practice (*Killian* v. *United States,* 368 U.S. 231, 242 [7 L.Ed.2d 256, 264-265, 82 S.Ct. 302]) as distinguished from bad faith suppression of evidence vital to the defense (*People* v. *Hitch,* 12 Cal.3d 641, 652-653 [117 Cal.Rptr. 9, 527 P.2d 361]).

Defendant next complains of two alleged instances of prejudicial prosecutorial misconduct,[14] as the jury was told that: 1) defendant had admitted the violation of Penal Code section 12303.2, count II, and 2) it was unnecessary to decide whether he had acted recklessly in order to convict him of the offense charged. The record indicates that no objections to these two instances of alleged prejudicial misconduct were made below. Generally, failure to object forecloses consideration of misconduct on appeal (e.g., *People* v. *Jenkins,* 40 Cal.App.3d 1054, 1057 [115 Cal.Rptr. 622]; *People* v. *Asta,* 251 Cal.App.2d 64, 87 [59 Cal.Rptr. 206]).

The waiver rule yields only when the case is closely balanced and presents grave doubt of the defendant's guilt and the misconduct contributed materially to the verdict, or its results could not have been obviated by a timely admonition to the jury (*People* v. *Varnum,* 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553]; *People* v. *Mitchell,* 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Meneley,* 29 Cal.App.3d 41, 58 [105 Cal.Rptr. 432]). The instant case does not fall within these exceptions to the waiver rules. Alleged misconduct by the

[14]Misconduct is a dishonest act or an attempt to persuade the court or jury by the use of deceptive or reprehensible methods (see *People* v. *Strickland,* 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]; *People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Romo,* 47 Cal.App.3d 976, 987 [121 Cal.Rptr. 684]; *People* v. *Johnson,* 39 Cal.App.3d 749, 763 [114 Cal.Rptr. 545]).

prosecution constitutes grounds for reversal only if it is probable that a result more favorable to the defendant would have occurred but for the impropriety (*People* v. *Strickland, supra,* 11 Cal.3d at p. 955; *People* v. *Beivelman, supra,* 70 Cal.2d at p. 75; *People* v. *Johnson, supra,* 39 Cal.App.3d at p. 763). We think the overwhelming evidence is to the contrary.

■ Here, the statement that defendant admitted the possession of an explosive device and dynamite in a motel room, charged in count II, was merely a comment upon the evidence adduced at trial. The prosecution may properly comment upon the evidence presented at trial and may offer to the jury its views of the proper deductions or inferences to be drawn from the facts. While the prosecution's reasoning may be faulty and his deductions totally illogical, these matters are ultimately for the jury's consideration (see *People* v. *Washington,* 71 Cal.2d 1061, 1084-1085 [80 Cal.Rptr. 567, 458 P.2d 479]; *People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1]; *People* v. *Hardy,* 271 Cal.App.2d 322, 330 [76 Cal.Rptr. 557]; *People* v. *Dillinger,* 268 Cal.App.2d 140, 144 [73 Cal.Rptr. 720]).

■ The prosecutor's comment that the jury did not have to reach the question of recklessness, if it decided that defendant acted maliciously, was a statement regarding the elements of the offense. Even erroneous comments concerning the law do not constitute misconduct unless made in bad faith (see *People* v. *Meneley,* 29 Cal.App.3d 41, 61 [105 Cal.Rptr. 432]; *People* v. *Calpito,* 9 Cal.App.3d 212, 222 [88 Cal.Rptr. 64]; *People* v. *Jones,* 205 Cal.App.2d 460, 467 [23 Cal.Rptr. 418]). Here, however, the prosecution's remark was accurate· for under the disjunctively phrased statute, the prosecution did not have the burden of proving that defendant acted with *both* malice and recklessness. We can only conclude that the record does not show any misconduct or prejudice to defendant.

Finally, we turn to the contention that the punishment of from five years to life for a violation of Penal Code section 12303.2, constitutes cruel and unusual punishment within the language of article I, section 17 of the state Constitution. We do ·not deem it necessary to deal with the facial validity of the statute and its prescribed punishment (*In re Lynch,* 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]) as his contention is that the punishment as applied to him is cruel and unusual, as he intended only to defraud and not to injure or detonate the.bomb. Assuming this to have been his intent, we recognize that a defendant who possesses one

stick of dynamite and an undetonated device should be less severely punished than a person with a more dangerous device and the intent to injure. However, we do not have to reach the question of the merits on the basis of the three-pronged test outlined by our Supreme Court (*In re Lynch, supra*). Recently, that court held in *People* v. *Wingo,* 14 Cal.3d 169, at page 183 [121 Cal.Rptr. 97, 534 P.2d 1001], that "when a defendant convicted under a section encompassing a wide range of conduct challenges the statute as imposing cruel or unusual punishment, judicial review must await an initial determination by the Adult Authority of the proper term in the individual case. When the term is fixed a court can then analyze the constitutionality of the statute as applied." The court then went on to hold (at p. 184) that where, as in the instant case, the Adult Authority has not had a reasonable opportunity to fix a defendant's term, any prior attack is premature. ■ The proper avenue is by habeas corpus after defendant's term has been determined by the Adult Authority.

The judgment, as modified to read that defendant was guilty of "Possession of Destructive Device in a Public Building," in violation of Penal Code section 12303.2, is hereby affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 15, 1976.