[No. F054047. Fifth Dist. Jan. 27, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE ALAN ADAMS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., IV., and V. of the Discussion.

COUNSEL

Soloman Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORNELL, J.**—A jury convicted appellant Lawrence Alan Adams of arson, possession of a destructive device in public, and felony vandalism of 11 motor vehicles. It also found that Adams had prior convictions and had served a prior prison term. Adams contends his convictions should be reversed because of prosecutorial misconduct, insufficient evidence, and evidentiary and instructional errors. Adams also argues his sentence is erroneous and must be corrected. We will correct the sentencing error but otherwise affirm the convictions.

We publish the parts of this opinion that hold that the destructive device used here is prohibited by Penal Code section 12303.2,[1] and that the trial court has no sua sponte duty to define the term "breakable" for the jury.

## FACTUAL AND PROCEDURAL SUMMARY

On July 6, 2007, Adams was a transient camped illegally on private property. Officer John Mager, Jr., ordered Adams to break camp and move. Mager saw a campfire, cooking pots, matchbooks, spray paint cans, newspapers, and a tent at the campsite. While moving his campsite, Adams called his girlfriend from his cell phone. Adams was ranting, raving, and expressing his frustration with the police and government.

Late the next day, Robert Mastro, who had been working, saw someone in the police rooftop parking lot across from where he had parked his car. The person was wearing black clothing, including a sweatshirt with the hood over his head. Mastro thought the person was dressed strangely for a hot summer night. He also noticed that the person's sweatshirt was bulging in an attempt to conceal something underneath.

The man Mastro saw was walking away from a smoldering Dodge Durango. When Mastro and the man made eye contact, the man ran and Mastro pursued him on foot. The flames began to spread from the gas tank and Mastro called for help. Within minutes, patrol units descended.

When Officer Jerry McCaig arrived at the parking lot, he noticed the gas cap of the Durango was hanging open. Several matchbooks had been placed in the neck of the gas tank. The matchbooks had had the covers and the rough striker surface removed. The taillight had burn marks, and a pattern had formed underneath the gas tank and on the rear bumper where liquid had been poured. The tailgate was stuck shut. A puddle of liquid was on the ground along with a burnt matchbook. The matchbooks found in the gas tank and on the ground were identical to those later found on Adams.

Shortly thereafter officers observed an individual, dressed as Mastro had described, who was carrying two brown paper bags. McCaig and another officer followed the individual, who turned out to be Adams. When ordered to stop, Adams began to walk faster and then began to run. The officers chased

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Adams, who dropped one of the paper bags near the bottom of a set of stairs. He dropped the other bag on the stairs, where some of the contents scattered.

After dropping the bags, Adams continued to run. While running, a wrench and three rolled-up papers fell from his pocket. Each paper had been rolled into a tightly wound tip. Adams continued to run but eventually was intercepted by an officer and restrained at gunpoint.

When arrested, Adams had in his pockets a cigarette lighter, seven matchbooks with torn-off covers and strikers, a flashlight, and a battery cable connector. Adams did not have any cigarettes or tobacco in his pockets. Adams refused to give his name. When informed that his name would be ascertained from fingerprints, Adams responded, "do [your] fucking job."

The paper bags dropped by Adams were recovered. In the smaller bag were two Styrofoam cups inset together with liquid between the cups. Inside the inner cup were several matchbooks and small pieces of Styrofoam. The rim of the inner cup was cut to make it even with the outer cup; the cups were then compressed together, sealing the liquid in between. The liquid had a strong chemical odor. Three identical devices were found in the larger bag and a fifth such device was in the vicinity of the larger bag. The larger bag also had eight books of matches with torn-off covers and small bits of Styrofoam.

Sometime between July 6 and July 9 a county-issued sheriff's car was vandalized. The vehicle had been spray painted on both sides with brown paint. The message "fuck you" was painted on the driver's side and swastikas were painted on the trunk and hood. Other cars in the lot that were not sheriff's vehicles were untouched.

Between the afternoon of July 7 and the morning of July 8, 10 probation department vehicles were vandalized. The cars looked like law enforcement vehicles because they were equipped with built-in prisoner cages. Four vehicles had swastikas on the hoods and the others had been spray painted all around.

Mager investigated both vandalism reports. He noted similarities in the color of the paint and the swastika images. He also noted that the sheriff's lot, probation department's lot, and police parking lot were all within a mile of each other. Mager contacted Adams while he was being held in the county jail and examined his hands. Mager noted that Adams had paint splatter on his hands, knuckles, fingers, and fingernails.

Adams was charged with arson, possessing a destructive device in public, felony vandalism of 10 motor vehicles belonging to the probation department,

and felony vandalism of a vehicle belonging to the sheriff's department. It also was alleged that Adams had been convicted of assault with a deadly weapon and carjacking in 2000 and criminal threats, auto theft, and false reporting of an explosive in 1999.

Dennis Townsend, an arson investigator with the Department of Forestry and Fire Protection, inspected the damaged Dodge Durango. He testified the damage to the taillight was caused by a burning from an open flame and a liquid accelerant. The stuck tailgate was consistent with heat damage. There were liquid marks from the rear windows to the gas cap and bumper.

Townsend also examined the Styrofoam devices and opined that the devices were incendiary devices intended to cause destruction by fire. They appeared to have been assembled meticulously and the components were all flammable. Townsend testified that Styrofoam is a liquefiable solid that can be compressed to seal a flammable liquid. The matchbooks with torn-off covers, found in the top cup of each device, made the matchhead immediately ignitable. Multiple matchbooks mixed with Styrofoam pieces would intensify the flame. The lighting of the matchbook would create an immediate combustion and the flashpoint of the flammable liquid between the cups would occur shortly thereafter.

As for the three pieces of rolled-up paper, Townsend opined the papers were ignition devices, like a wick. He testified they appeared to be purposefully rolled in a similar fashion.

Sarah Yoshida, a senior criminalist, examined the liquid sealed between the Styrofoam cups. She determined it was flammable isopropanol. Swabs of the fuel tank spout and rear bumper showed that kerosene, charcoal starter, diesel, and gasoline were all present.

Adams testified that the devices were used by him to strain white phosphorus from the matches to make methamphetamine. He acknowledged that he possessed brown spray paint and claimed he used it to start campfires. Adams claimed he was dressed in a sweatshirt and hood because low blood sugar made him feel cold constantly and that he wore all black to avoid being noticed by people. Adams also claimed he had matches because he smoked cigarettes.

The trial court granted the prosecution's motion to strike the assault with a deadly weapon allegation. The jury found Adams guilty of all charges. In a bifurcated trial, the remaining prior conviction allegations were found true. Adams was sentenced to a total term of imprisonment of 63 years eight months to life.

# DISCUSSION

Adams raises several contentions on appeal, including (1) prosecutorial misconduct; (2) insufficient evidence that the Styrofoam devices qualified as destructive devices; (3) the trial court had a sua sponte duty to define the term "breakable" for the jury; and (4) expert testimony undermined his right to a trial by jury. Adams also contends, and the People concede, that his prior conviction for carjacking cannot be used to impose a five-year term pursuant to section 667, subdivision (a) and a one-year term under section 667.5.

## I. *Prosecutorial Misconduct**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. *Sufficiency of the Evidence of Destructive Devices*

Adams contends the evidence was insufficient to support a conviction pursuant to section 12303.2 because the Styrofoam devices did not constitute destructive devices within the meaning of section 12303.2. Adams bases this contention on the argument that Styrofoam does not shatter in the same way as glass, and the devices he constructed were not designed to be thrown or to explode. Adams's argument is not persuasive.

Section 12303.2 is violated when a person recklessly or maliciously has in his possession any destructive device on a public street or in a public building. The term "destructive device" is defined in section 12301. The charging allegation was that the Styrofoam devices containing isopropanol with matchheads were destructive devices.

Section 12301, subdivision (a)(5) defines a destructive device as any "breakable container which contains a flammable liquid with a flashpoint of 150 degrees Fahrenheit or less and has a wick or similar device capable of being ignited." Adams concedes that the Styrofoam cup devices contained a flammable liquid with a flashpoint of 150 degrees Fahrenheit or less and that the devices had a wick capable of being ignited. He contends, however, that the Styrofoam cups were not "breakable" containers and therefore these devices were not destructive devices.

Adams cites no statute or case law that holds the "breakable container" must shatter like glass. The statute does not state that a breakable container must shatter; it simply states that the container be breakable. (§ 12301, subd. (a)(5).) The term "breakable" is not defined in the statute.

---

*See footnote, *ante*, page 893.

■ "Breakable" is defined in the dictionary as something "that can be, or is liable to be, broken" or as "a thing easily broken." (Webster's New World Dict. (3d college ed. 1988) p. 172.) In our view, one cannot argue reasonably that Styrofoam is not breakable. Common experience tells us that it easily can be broken by slight pressure from a hand or an object pressing upon it. Styrofoam, therefore, is a "thing easily broken" or something "that can be, or is liable to be, broken." ■ Furthermore, in order to constitute a destructive device, the device need not be capable of exploding immediately. (*People v. Heideman* (1976) 58 Cal.App.3d 321, 335 [130 Cal.Rptr. 349].)

The evidence clearly was sufficient to support the conviction.

### III. *Sua Sponte Duty to Define "Breakable"*

Adams also argues that the trial court had a sua sponte duty to define the term "breakable" for the jury. We disagree.

■ Adams did not request that the trial court instruct the jury on the term "breakable." A trial court has no sua sponte duty to define words in common usage, absent a request. (*People v. Eastman* (1993) 13 Cal.App.4th 668, 673 [16 Cal.Rptr.2d 608].) The term "breakable" is not a technical term; persons of common intelligence know what "breakable" means. (See *People v. Dimitrov* (1995) 33 Cal.App.4th 18, 25 [39 Cal.Rptr.2d 257] [term "bomb" needs no definition].)

■ The prosecution submitted CALCRIM No. 2575, modified as required to describe a destructive device. Adams neither objected to the giving of this instruction, nor asked for any additional clarifying instructions. A trial court cannot be expected to improve or revise standard instructions absent a request. (*People v. Kelly* (1992) 1 Cal.4th 495, 535 [3 Cal.Rptr.2d 677, 822 P.2d 385].) ■ Adams cannot claim error here for the failure of the trial court to define a term in common usage absent an objection to the instruction or a request for a clarifying instruction. (*Id.* at pp. 535–536.)

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 893.

## DISPOSITION

The section 667.5, subdivision (b) enhancement is hereby stricken. In all other respects the judgment is affirmed. The trial court is instructed to correct the abstract of judgment and forward it to the appropriate agencies.

Wiseman, Acting P. J., and Hill, J., concurred.

A petition for a rehearing was denied February 11, 2009, and appellant's petition for review by the Supreme Court was denied April 29, 2009, S170984.