Filed 1/12/15  P. v. Espinoza CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE FRANCISCO CHICAS ESPINOZA,<br><br>    Defendant and Appellant. | B252273<br><br>(Los Angeles County<br>Super. Ct. No. VA127982) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Torribio, Judge.  Affirmed as modified.

Richard Morrow for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan J. Kline and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jose Francisco Chicas Espinoza seeks reversal of his convictions, asserting an unduly suggestive photographic lineup; the absence of a certified sign language interpreter to interpret the pre-lineup admonition for a hearing-impaired victim of the crime; ineffective assistance of counsel; and prosecutorial misconduct. We affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

Chicas was charged with the attempted murders (Pen. Code,[1] § 664/187) of Jarod Smith and Tyrone Hunt; shooting at an inhabited dwelling (§ 246); two counts of shooting from a motor vehicle (§ 26100, subd. (c)); and possession of a controlled substance (Health and Saf. Code, § 11377, subd. (a).) Except for the controlled substances charge, each offense was alleged to have been committed for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). Enhancement allegations under section 12022.53, subdivisions (b) and (c) were also alleged as to the counts alleging attempted murder and shooting at an inhabited dwelling.

At trial, Hunt testified that at 3:15 p.m. on December 18, 2012, he and Smith were standing in front of Hunt's house. Hunt's mother was inside. Hunt saw a red truck, a truck Hunt identified from photographs as a red Toyota 4Runner, approach the house. The driver and sole occupant of the truck, whom Hunt identified at trial as being Chicas, yelled at them and made gestures. Hunt, whose hearing was impaired but who had some lip-reading ability, was approximately 30 feet away from Chicas. Chicas appeared to have been shouting, "What's up?"

Chicas fired three shots toward Hunt and Smith, then backed up his truck and fired twice more.[2] Hunt ducked, and Smith tried to jump away. It appeared to Hunt that the first three shots were directed at him and the last two were aimed at Smith. Hunt testified

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] Hunt testified that although he was hearing impaired, he could hear loud noises like gunshots.

that he saw the gun was a .38 caliber revolver. Chicas made an M-shaped gesture with his fingers that Hunt recognized as the sign for the 99 South Side Mafia gang. As Chicas drove away, Hunt looked at the truck and noticed stickers on the back of the vehicle.

Hunt had seen Chicas twice before the shooting. He explained he had "just seen him [Chicas] around like going by." When asked where he had seen Chicas, he replied, "I don't know. Well, I saw him, you know—you know, like there is a store. I saw his face I was driving by there and I saw his face." Hunt knew the exact house where Chicas lived. Hunt, who lived in Hat gang territory, denied being a member of that gang, although he admitted being "friends" with the gang and acknowledged that most of his friends were members. The Hat gang and the 99 South Side Mafia gang were rivals. Chicas lived nearby on 99th Street, in 99 South Side Mafia territory.

Deputy Sheriff Micah Lopez responded to the home after the shooting. He observed damage that appeared to be from a bullet on the front porch, a front tile on the steps to the porch, and on the vertical bars on the fence in front of the home. Lopez recovered two bullet fragments but no bullet casings.

The following day, gang unit detective Noelle Judge and her partner patrolled to see if they could locate the suspect's vehicle and interview Hunt. Judge saw a red Toyota 4Runner parked in front of a house on 99th Street. Judge's partner told her that a 99 South Side Mafia gang member, Chicas, lived at the residence where the vehicle was parked. The 4Runner was registered to Jose F. Chicas Jimenez on East 99th Street.

Judge immediately returned to the station, where she prepared a photographic lineup including Chicas and printed out a photograph she had taken of the 4Runner. She arranged to go to Hunt's home to show him photographs. On the way to Hunt's home, Judge drove down 99th Street past Chicas's home and saw Chicas standing outside. Judge and her partner detained Chicas.

Chicas told the officers that he only had "casings and dope" in his house, if that what they were looking for. Judge's partner took the keys to the 4Runner from Chicas. During the officers' protective sweep of Chicas's residence, they saw in plain view in Chicas's room some shell casings and a small plastic bag containing an off-white

3

substance the officers believed to be narcotics. After the house was secured, Judge went to Hunt's home to show him the photographic lineup that she had prepared.

Hunt identified Chicas from the photographic lineup and identified the 4Runner as the vehicle that Chicas was driving. The prosecution sought to introduce the lineup from which Hunt had selected Chicas as the shooter. Defense counsel objected on the grounds that Chicas was the only man pictured without a shirt on, exposing a prejudicial chest tattoo. The court examined the photographic lineup and ruled, "You are correct, but I would note for the record that the facial features are remarkabl[y] similar for all the subjects. I think that goes more to the weight. Something you can show to the jury. I'm not going to exclude it."

Hunt testified about the process of the identification. He testified that he had signed a form entitled, "Six Pack 'Mug' Show Up Admonishment." At first he said he did not read it and that "[i]t was just at the last minute I signed it and then I left," but later, he testified that he had read "that one paragraph" and then signed it. He explained that he circled the photograph of Chicas in the first position of the photographic lineup because the detective said to circle the photograph of the shooter. The prosecutor asked whether Hunt was "a hundred percent sure" at the time of the identification, and Hunt answered, "Well, actually, with his hair, and the hat, it could have been four or one." The prosecutor asked Hunt about his preliminary hearing testimony, and Hunt acknowledged that he had identified Chicas as the shooter at that time. Hunt identified Chicas as the shooter at trial and testified that he was one hundred percent sure that it was Chicas who shot at him.

On cross-examination, defense counsel questioned Hunt about his observations of the shooter and his conversations with police. Hunt testified that the shooter was wearing a long-sleeved hooded sweatshirt and a cap. Defense counsel asked, "Did you tell the officers that the shooter wore this black hoodie?" Hunt replied, "The detective, you know. All they did was ask me about the pictures and I pointed to the picture." "So they didn't ask you about the clothing of the shooter?" counsel asked. Hunt said, "They did ask me questions, you know. And said, you know, it was that. It was Jose and so I was

4

like okay." Hunt explained how he knew the shooter was the person with the photo in the first position (Chicas) as opposed to the person whose photo was in the fourth position of the photographic lineup: "Really, I noticed the nose was a little bit wide, little bit big and then number 4 had a narrower one so I knew it was number 1." Hunt did not mention the person in the fourth position to the police.

Hunt confirmed that the officers told him before showing him the photographic lineup that they were going to show him pictures and that one of them was the person they believed had shot at them. Defense counsel asked whether they pointed to that person before Hunt made the identification, and Hunt answered, "No. They can't do that. They said to point and they talked to Smith. And then the next day, they talked to me, and they said the person who did the shooting and that they were coming over. I signed that paper, and then, secondly, they showed me the pictures of the shooting." Hunt testified that they showed him a first lineup and there was "nothing there," but then in the second lineup, he identified the shooter. He said he made the identification quickly. Defense counsel said, "[Y]ou did not point out number 4 as well?" "No," said Hunt. "Smith pointed to that one and I said uh-huh. It's the one above. I could see clearly that was his nose. That wide nose."

After Hunt identified Chicas, Judge obtained a warrant to search Chicas's home. During her search, she recovered five expended .38 caliber casings and a container containing what she believed to be methamphetamine.

The prosecution presented the testimony of firearms examiner Tracy Peck, who examined the bullet fragments collected from the Hunt home. The first fragment was a fired medium caliber bullet core, between .30 and .40 caliber. The second was a fired bullet consistent with bullets loaded in .38 special and 357 magnum caliber cartridges. Peck testified that .38 special and 357 magnum cartridges are almost exclusively fired in revolver-type handguns. She also examined five fired .38 special caliber cartridge cases, which would remain inside the chambers of a handgun until they were manually removed.

5

The parties stipulated, and the jury was advised, that (1) the substance taken from Chicas was methamphetamine; and (2) two fingerprints were lifted from the 4Runner on December 26, 2012, and both matched Chicas's left thumb. Criminalist Cristina Gonzalez testified that she had taken samples from the 4Runner for gunshot residue testing. Crime laboratory scientist Kristina Fritz determined through testing that the samples contained gunshot residue.

The prosecution presented evidence that Chicas was an active participant in a criminal street gang, that the gang had engaged in a pattern of criminal activity, and that the crime was committed for the benefit of the gang.[3]

Chicas presented an alibi witness, Hector Avila, who testified that he and his cousin Chicas were at work in Avila's cabinetry shop at the time of the shooting. In rebuttal, Judge testified that when she interviewed Chicas after his arrest, he offered several different explanations of where he had been the day of the shooting. Eventually, he said his mother would be able to vouch for where he was. Chicas never claimed he was working that day.

Chicas was convicted on all counts, with the gang and other enhancement allegations found true.[4] He was sentenced to a total term of 70 years to life in state prison. Chicas appeals.

---

[3] The testimony that Chicas committed the charged offenses for the benefit of his gang was elicited without the use of hypothetical questions, in violation of *People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049. Defense counsel did not object, and the issue has not been raised on appeal.

[4] The jury failed to make any finding with respect to the gang enhancement on the charge of shooting from a motor vehicle at Hunt, count 5. When reading the verdict aloud, the clerk noticed that the jury had left blank the space to fill in true or false on the gang enhancement. The court told the parties, "[T]he court will accept the verdicts as they presently exist. The court finds harmless error regarding that one issue. We don't need any further discussions." The court later remarked, "Based on the findings on counts 1 through 3, I saw no reason to worry about it." "That's fine," responded the prosecutor. At sentencing, however, the court imposed and stayed a five-year gang enhancement pursuant to section 186.22, subd. (b)(1)(B) on count 5. Because of the stay this error does not affect the length of Chicas's sentence to be served, but it must

6

**DISCUSSION**

## I.      Suggestiveness of the Photographic Lineup

Chicas unsuccessfully objected to the introduction of the photographic lineup shown to Hunt on the ground that Chicas was the only man pictured without a shirt on, exposing a chest tattoo that was prejudicial.  He argues on appeal that the lineup was unduly suggestive for this and other reasons.  "'Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.'  [Citation.]  The question is not whether there were differences between the lineup participants, but 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.'  [Citation.]  We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.'  [Citation.]"  (*People v. Avila* (2009) 46 Cal.4th 680, 698-699.)

The photographic lineup was highly suggestive.  Chicas is the only one of the six individuals in the lineup who was not wearing a shirt when photographed.  Chicas's photograph features an expanse of bare skin, with a sizeable tattoo of a partially visible phrase that appears to cross his chest.  The only word of the tattoo that can be read in the photograph is the word "death."  In contrast to Chicas, in the other photographs the pictured individuals are wearing plain white or black t-shirts, in one case with a black and white shirt over the t-shirt.  While there is no need for law enforcement to match the outfits of everyone in a lineup, it has been said that the defendant should not be "alone

nonetheless be corrected.  "If a trial court imposes a sentence unauthorized by law, a reviewing court may correct that sentence whenever the error is called to the court's attention." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 811.)  "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case.  Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 354.)  As the sentencing court here could not have imposed the gang enhancement on count 5 without a jury finding, we modify the judgment accordingly.

dressed in a 'striking' manner." (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 790.) Here, Chicas was alone undressed in a striking manner: his bare-chested, tattooed photograph leaps out of the lineup at even a casual glance. We conclude that Chicas's photograph stood out from the others in a way that would suggest a witness should select him and that the photographic lineup used to identify Chicas was therefore unduly suggestive.

Because the pretrial identification procedure was unduly suggestive, we must consider whether Hunt's identification of Chicas was "nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) We conclude that the identification was reliable under the totality of the circumstances. Hunt made his identification the day after the shooting. Hunt had observed Chicas from a distance of 30 feet, during the daytime. Importantly, Hunt was not identifying a stranger but instead a person he already was familiar with, for he had seen Chicas before and even knew exactly where Chicas lived. Hunt first narrowed the candidates to Chicas and the person with the photograph in position four: when asked if he was completely sure when he identified Chicas from the photo lineup, he responded, "[W]ith his hair, and the hat, it could have been four or one." Hunt, however, explained that he had determined that the shooter was Chicas as opposed to the person whose photo was in the fourth position because he remembered Chicas's nose: "I noticed the nose was a little bit wide, little bit big and then number 4 had a narrower one so I knew it was number 1." Hunt testified that he recognized Chicas in the lineup "fast, really quick[ly]." Moreover, Hunt was sufficiently confident in his identification that he rejected the other victim's identification of a different suspect: "Smith pointed to that one [number four] and I said uh-huh. It's the one above. I could see clearly that was his nose. That wide nose." The record reflects that Hunt selected Chicas from the lineup based on his nose,

8

not on his shirtless condition or his tattoo. Based on our review of the record, we conclude that Hunt's identification of Chicas was constitutionally reliable.

Chicas's briefing contains other arguments about the composition of the photographic lineup in support of his contention that the lineup was unduly suggestive, but we need not consider these arguments in light of our determination that the lineup was unduly suggestive as discussed above. Also presented as a suggestiveness argument, although it concerns a challenge to conduct before the lineup rather than the photographic lineup itself, is Chicas's claim that "[t]he Los Angeles Sheriff's Department, despite their obvious good intentions, told the witness who they thought had shot at him prior to asking Mr. Hunt to choose someone from the lineup." Here, Chicas is referring to a passage in Hunt's cross-examination in which Chicas's counsel asked Hunt whether the police had asked what the shooter was wearing. Hunt responded, "They did ask me questions, you know. And said, you know, it was that. It was Jose and so I was like okay." This statement is highly ambiguous. While it can be interpreted in the manner Chicas now suggests, it is far from certain that this is what Hunt was saying.[5] Indeed, Hunt's testimony does not appear to have been understood by any of the participants at trial as a claim that law enforcement told Hunt who the shooter was in advance of presenting the photographic lineup. Defense counsel, who elicited that testimony from Hunt, asked no clarifying questions, did not object to the identification on the ground that the officers had supposedly told Hunt who the shooter was, and did not argue in closing argument that the investigating officers had told Hunt before the lineup that Chicas was the shooter. As this issue was not raised below and none of the trial participants appears to have interpreted Hunt's testimony in the manner Chicas now advocates, on the record presented this ambiguous sentence is insufficient to permit us to conclude on direct appeal that the pretrial identification was tainted by police misconduct.

---

[5] Chicas's interpretation is not easily reconciled with Hunt's response to defense counsel's question whether the officers "pointed to which one it was before you made the identification." Hunt responded, "No. They can't do that," a curious response if Hunt had actually meant to testify moments earlier that he had been advised by the police of the identity of the shooter prior to the lineup.

Finally, Chicas argues that Hunt identified him "based on suggestions from law enforcement" because "detectives that conducted the identification via the 6-pack said to Mr. Hunt that one of the people depicted in the photographs was the shooter [citation]." Chicas is referring to a question asked by defense counsel on cross-examination of Hunt: "Prior to seeing the 6-pack, did the officers make a statement such as we are going to show you some pictures right now and one of them is the guy we think shot at you?" "Yes," said Hunt. This does not render the identification invalid. "The advice that a suspect was in the lineup did not suggest to the identifying witness anything more than he would assume, and in no way suggested that defendant was the suspect rather than one of the other . . . members of the lineup." (*People v. Meneley* (1972) 29 Cal.App.3d 41, 57, overruled on another ground in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214, as stated in *People v. Hill* (1998) 17 Cal.4th 800, 822 (*Hill*).)

## II.      Conducting Photographic Lineup without Certified Interpreter

Chicas argues that the entire photographic lineup and resultant identification should have been excluded because the detectives did not use a certified sign language interpreter to give Hunt the standard admonition before showing him the photographic lineup. As Chicas did not seek to exclude the lineup on these grounds at trial he has forfeited this issue on appeal. (*People v. Alvarez* (1996) 14 Cal.4th 155, 186.)

## III.      Ineffective Assistance of Counsel

Chicas alleges that his attorney provided ineffective assistance at trial by failing to call specific witnesses; by failing to cross-examine Hunt regarding a discrepancy between his preliminary hearing testimony and his trial testimony concerning the shooter's vehicle; and by failing to cross-examine Hunt concerning his gang membership or affiliation. To establish ineffective assistance of counsel, Chicas must demonstrate that "(1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability

10

that, but for counsel's failings, the result would have been more favorable to the petitioner." (*In re Jones* (1996) 13 Cal.4th 552, 561.)

A.  Failure to Call Additional Witnesses

Chicas contends that his trial counsel should have called the other victim of the shooting, Smith, to testify, because from Hunt's trial testimony it appeared that Smith had identified another person as the shooter from the photographic lineup.  He also contends that counsel should have called not only Chicas's boss but his co-workers to testify to his alibi that he was at work at the time of the shooting.  As Chicas notes, the record is silent as to why Smith was not called as a witness, and it is also silent as to why other alibi witnesses were not called.  "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . .' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 333 (*Bolin*).)  Chicas argues that "a competent attorney" would have called Smith as a witness, perhaps suggesting that this issue is properly raised on appeal because there could be no reasonable strategic reason for not calling Smith as a witness.  To the extent that Chicas intends to make such an argument, we cannot say on this record that there could be no rational tactical purpose for not calling these witnesses.  Accordingly, Chicas's claim must be denied on direct appeal.  (*Ibid.*)

Moreover, even if counsel's failure to call further witnesses constituted representation falling below an objective standard of reasonableness for professional representation, it also cannot be determined on this record whether the result would have been more favorable to Chicas if counsel had called them to testify.  Proof of these matters requires a showing beyond the scope of the record on appeal.  For this reason, the California Supreme Court has held that a claim of ineffective assistance of counsel based on counsel's alleged failure to act in a particular manner should be raised in a habeas corpus proceeding.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [a claim of ineffective assistance of counsel relating to why counsel acted or failed to act in a

11

specific manner "is more appropriately decided in a habeas corpus proceeding"] (*Mendoza Tello*); see also *People v. Jones* (2003) 29 Cal.4th 1229, 1263 [issues requiring review of matters outside the record are better raised on habeas corpus rather than on direct appeal] (*Jones*).) As Chicas has neither established that his counsel's performance fell below an objective standard of reasonableness nor demonstrated a reasonable probability that the result would have been different had these witnesses been called to testify, we decline to reverse his conviction on this ground on direct appeal.

B. Failure to Cross-Examine Hunt Regarding Vehicle

Next, Chicas argues that his counsel was ineffective for failing to cross-examine Hunt at trial concerning the fact that he testified at the preliminary hearing that the shooter was driving a Ford truck, but at trial testified that the vehicle was a Toyota 4Runner. Chicas contends that there was no rational reason for not cross-examining Hunt about this discrepancy, as it was a critical difference that could have led the jury not to convict him.

Hunt identified the vehicle as a red Ford at the preliminary hearing. At trial, Hunt did not initially identify the shooter's vehicle as a Toyota 4Runner and indicated uncertainty about the type of vehicle: "It was a red tailor. It's a truck, something. T-A-I-L something. I'm not sure about that. But it's red in color, a truck." Once the prosecutor showed him the photographs of the Toyota 4Runner, he identified that specific vehicle as the one driven by the shooter, and the vehicle was thereafter referred to as a 4Runner. Given that Hunt had identified the vehicle from a photograph as belonging to the shooter the day after the shooting, at the preliminary hearing, and at trial, counsel may have considered this discrepancy insignificant, or he may have concluded that cross-examination would only result in further emphasis on the identifications. Because we cannot say that the record demonstrates an absence of any rational tactical purpose for the failure to cross-examine Hunt over the maker of the vehicle, Chicas's claim must be denied on direct appeal. (*People v. Ray* (1996) 13 Cal.4th 313, 349 ["In order to prevail on [an ineffectiveness] claim on direct appeal, the

12

record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].) Furthermore, even if the failure to cross-examine Hunt about the vehicle did in fact constitute representation falling below an objective standard of reasonableness for professional representation, we cannot determine on this record whether the outcome would have been more favorable to Chicas if counsel had cross-examined Hunt on this subject. The matter must be raised by petition for habeas corpus. (*Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267; *Jones*, *supra*, 29 Cal.4th at p. 1263.)

C. Failure to Cross-Examine Hunt Concerning Gang Affiliation

Last, Chicas argues that his trial counsel should have cross-examined Hunt concerning discrepancies in his testimony about gang membership. At the preliminary hearing, Hunt admitted being a gang member. At trial, however, he denied being a gang member, although he admitted he was "friends" with the gang. Chicas argues that there was no rational tactical reason for not cross-examining Hunt about this change in his testimony, given that gangs played a major role in this case. Chicas, however, does not argue that the failure to cross-examine Hunt concerning gang membership prejudiced him in any way, nor does he contend or show that there was a reasonable probability that, if counsel had cross-examined Hunt on this subject, the result would have been more favorable to him. (*In re Jones*, *supra*, 13 Cal.4th at p. 561.) Because Chicas made no showing that the result would have been different had this cross-examination taken place, he has not established any entitlement to a reversal of his conviction on this ground. (*Bolin*, *supra*, 18 Cal.4th at p. 333 [if the defendant makes an insufficient showing on either prong of the ineffectiveness inquiry, the claim fails].)

IV.    **Prosecutorial Misconduct**

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.]

13

Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]' [Citation.]" (*Hill*, *supra*, 17 Cal.4th at p. 819.)

Chicas first contends that the prosecutor committed misconduct during the cross-examination of the sole defense witness, Avila, when he asked questions concerning Chicas's membership in a gang, tattoos, and graffiti. Chicas did not object to this line of inquiry. "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper" conduct. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) Although Chicas generally asserts that the proceedings were so "tainted and infected" with prosecutorial misconduct that objections to any of the misconduct would have been insufficient to cure the harm, this conclusory statement is insufficient to establish that an admonition would have been insufficient to remedy any harm caused by the allegedly overbroad cross-examination of Avila. This is the first instance of prosecutorial misconduct Chicas alleged in the trial, so the proceedings could hardly have been tainted or infected at that point. Chicas has therefore forfeited this argument by failing to object at trial.

Next, Chicas alleges misconduct during closing argument. In closing, the prosecutor told the jury that it could not speculate: "And lastly, you can't speculate. You can't speculate why didn't Jarod Smith testify, why didn't the police do this, why didn't the police do that, why didn't the defendant testify. He has an absolute right not to testify. Things like that you can't speculate as to what the evidence is." Chicas contends that the mention of his failure to testify constituted prosecutorial misconduct, and theorizes that the prosecutor was actually trying to "get the jury to consider that fact and hold it against the defendant." Here again, Chicas did not object to the prosecutor's statement, although he asserts that "nothing can cure this transgression."

Assuming for the sake of argument that the claim is not forfeited due to the failure to object, we find no misconduct here. The prosecutor did not suggest that the jury could consider Chicas's failure to testify in deliberations, which would be impermissible. (*Griffin v. California* (1965) 380 U.S. 609, 613.) The prosecutor's comments were completely consistent with the jury instruction advising the jury that the defendant has an absolute constitutional right not to testify and that the jury may not consider his failure to testify in their deliberations. (CALCRIM No. 355.) Chicas's contention that the prosecutor was engaging in reverse psychology and was actually suggesting that jurors consider Chicas's failure to testify while telling them that they could not do so requires this court to assume that the prosecutor was saying one thing while meaning the opposite. There is no evidence in the record to support such a conclusion. "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) As Chicas has not shown a reasonable likelihood that the jury understood the prosecutor's admonition not to consider Chicas's failure to testify as an invitation to consider his failure to testify, he has not established prosecutorial misconduct.

Finally, Chicas argues that the prosecutor committed misconduct during closing argument when he said, "If the defendant was a better shooter, Tyrone [Hunt] and Jarod [Smith] could have been hurt and possibly killed." Here again, Chicas did not object to this statement at trial. On appeal he has argued only that the entire trial was so polluted by misconduct that no admonition would have been sufficient to cure the harm. He has not made any specific argument to demonstrate that the harm caused by this particular statement, if any, could not have been remedied by an admonition. Accordingly, Chicas forfeited his challenge to this statement by failing to object in the trial court. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205-1206.)

15

Our conclusion that Chicas has failed to establish prosecutorial misconduct in each of these instances disposes of his argument that cumulatively, these instances of alleged misconduct so infected the trial with unfairness as to render the conviction a denial of due process.

## DISPOSITION

The judgment is modified to strike the previously-stayed enhancement under Penal Code section 186.22, subdivision (b)(1)(B) with respect to count 5. The superior court is directed to prepare a corrected abstract of judgment and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.

FEUER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16